UNITED STATES, Appellant

v

RUFUS G. LOWE, Acting Sergeant, U. S. Marine Corps, Appellee

11 USCMA 515, 29 CMR 331

*Lieutenant Colonel J. E. Stauffer*, USMC, argued the cause for Appellant, United States. With him on the brief was *Commander Louis L. Milano*, USN.

*Lieutenant Colonel R. G. Coyne*, USMC, argued the cause for Appellee, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

On complaint of his wife, the accused was charged with two serious sexual offenses with his six-year-old step-daughter. A general court-martial acquitted him of one of the charges and convicted him of the other. It adjudged a sentence which includes a punitive discharge and confinement at hard labor for eighteen months. By divided vote, a board of review reversed the conviction on the ground that the law officer acted as a partisan advocate for the Government. In accordance with Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Navy certified the record of trial for review on the following issue:

"Were the actions of the law officer in his cross-examination of the accused, in his comments to the defense counsel, and in striking the testimony of defense witness Halloran prejudicial to the substantial rights of the accused?"

Before briefs were filed, appellate defense counsel moved to dismiss the certificate for review because it allegedly was not filed within thirty days of the time a copy of the decision of the board of review was received by the Government. Rule 25, Rules of Practice and Procedure, United States Court of Military Appeals, revised January 1, 1959. The motion was denied with leave to renew at oral argument of the certified issue. At that time, the motion was renewed and duly argued.

The board of review promulgated its decision on December 23, 1959. The original decision bears two time stamps —one indicates receipt by the West Coast office of The Judge Advocate General of the Navy on January 13, 1960; the other shows receipt in The Judge Advocate General's office in Washington on January 28, 1960. The certificate for review was filed in this Court on February 10, 1960, a time well within the prescribed thirty-day period if measured by either of the two date stamps. However, the certificate for review avers that the decision of the board of review was received by The Judge Advocate General on January 11, 1960. This date is also within the appeal period. But, it is alleged by appellate defense counsel, and not disputed by the Government, that the director of the West Coast office received a copy of the decision on December 23, 1959, the date of its promulgation and he forwarded the decision to The Judge Advocate General in Washington on January 6. Counsel contend that receipt of the decision in the West Coast office constituted receipt by The Judge Advocate General and started running the time for appeal. So measured, the certificate was filed too late.

In 1955, the Navy established a West Coast office of The Judge Advocate General. The legal status and functions of the office were described as follows:

"4. *Mission.* To process and review courts-martial cases as required by article 66 (b) and 66 (c) of the Uniform Code of Military Justice when such cases are tried in the geographic areas of the Eleventh, Twelfth, Thirteenth, Fourteenth, and Seventeenth Naval Districts and in

commands in the broad Pacific Area, and to promulgate to the pertinent commands the results thereof; to perform such other functions as the Judge Advocate General of the Navy may direct.

"5. *Legal Status.* In matters implementing and complying with the appointing orders of the Judge Advocate General of the Navy relative to Boards of Review and otherwise carrying out the mission as set forth in paragraph 4 hereof, this office and the Boards of Review therein are an integral part of the Office of the Judge Advocate General of the Navy, Navy Department, Washington, D.C." [SECNAV NOTICE 5450, December 9, 1955.]

It is immediately apparent that the organic directive providing for the West Coast office does not ■ purport to establish a separate branch office established under Article 68 of the Uniform Code of Military Justice, 10 USC § 868, which authorizes establishment of a branch "whenever the President . . . direct[s]." Instead, the West Coast office was established, to use the language of the SECNAV NOTICE, as an "integral part" of the regular office of The Judge Advocate General of the Navy. In the light of this language, it clearly appears that "process and review of courts-martial cases" by the West Coast office is as much the action of The Judge Advocate General of the Navy as similar procedures in his offices in the Pentagon. We conclude, therefore, that the thirty-day period for filing of the certificate for review under the rules of this Court began to run upon receipt of the decision of the board of review in the West Coast office.

Fixing the date for computation of the time to file the certificate does not fully determine the issue raised by appellate defense counsel's motion. Counsel concede that under Rule 29(c) the Government may be granted an enlargement of time upon a showing of "excusable neglect." Judged by the date of the receipt of the board of review's decision in the Washington office, The Judge Advocate General acted expedi-tiously; he filed the certificate for review within thirty days thereafter, and less than two weeks after he received the record of trial. It appears to us that his failure to file earlier arose out of a misunderstanding of the Navy Department's directive establishing the West Coast office. The record shows "excusable neglect." We, therefore, excuse the delay and deny the motion to dismiss.

Turning to the certified issue, the opinion of the board of review indicates that it relied upon two separate actions of the law officer to support its conclusion that he transgressed the requirements of impartiality and deprived the accused of a fair trial. First, the board of review considered the law officer's examination of the accused improper. It set out in its opinion a number of particularly objectionable questions. For example, on direct examination and on cross-examination by trial counsel, the accused contended that incriminating matters contained in a pretrial statement to a Hawaiian Service Police investigator were untrue. He maintained, in part, that he signed the statement after several hours of questioning during which he denied molesting his step-daughter in any way, because he finally "just didn't care what they did"; he concluded that if his wife wanted a divorce so badly as to turn him "in on false charges she knew . . .[he] hadn't committed," he would "just let her go." Part of the law officer's questioning on that point is as follows:

"Q. [Law Officer] Now, the things you did acknowledge. I see your signature on some of those. You did read those; you did acknowledge those?

"A. All I was doing, he'd find a mistake he made, maybe in spelling or something like that, and he would point to it, and I would sign my initials right over it, and he would read some more until he found another mistake, pointed to it again, and I would sign it. He was reading the paper, sir; not me.

"Q. So the truth of the matter is, you didn't know what you were signing then, did you?

"A. No, sir.

**517**

"Q. It might have been the Declaration of Independence or your discharge?

"A. Might have been, sir. I don't know. At that time, I was just in—

"Q. Did you think that this would have an effect on your wife? If I remember your testimony, you said that you didn't care what she did. It seems to indicate that you thought it was more than just a Declaration of Independence. Is that correct?

"A. No, sir. I wasn't particularly thinking it would have any effect on my wife. It was just that—I don't know—I more or less felt like I just lost all hope. I didn't care what I was signing, or—and therefore, I wasn't even reading what I was signing.

"Q. This is the question I want to to know, Sergeant: Why did you sign without reading? I mean, I'm interested to know why.

.    .    .    .    .

"Q. If you didn't read it, how do you know that she'd leave you alone if you signed it? I'm confused, Sergeant; I need help.

"A. Well, I don't know why I thought it, sir. It's just that—I just wanted to get out of the way from her, get her to leave me alone; and at that time, I was just more or less going to do anything to get her to leave me alone.

"Q. Then we can say that you thought if you signed this, that she would leave you alone?

"A. Well, in a sense, yes, sir.

"Q. You see, we're trying to find out, Sergeant, why you signed it; and you felt if you signed this, then she would leave you alone?

"A. Yes, sir, I did.

.    .    .    .    .

"Q. From the questions that Phillips [the investigator] asked you, you couldn't imply that the mother had something to do with your illegal, immoral activity with your stepchild? Did he ask you any disgusting questions that you objected to about your relationship with your daughter?

"A. No, sir."

Secondly, the board of review criticized the law officer for comments made in connection with defense counsel's attempt to impeach the investigator to whom the accused had given the pretrial statement. An important part of these comments is as follows:

"DEFENSE COUNSEL: It's my understanding that although Phillips was not warned not to discuss his testimony, it is my recollection that the Law Officer stated that he was sure he knew he wasn't supposed to discuss it with anybody except counsel for the accused, or Major Hunter over there, or with the accused. It's my understanding that subsequent to this statement by the Law Officer in open court, the Law Officer saw him out in the hall and warned him out there not to discuss his testimony. Now, if in the face of that—

"LAW OFFICER: I object to that. That is not in evidence. There is nothing here about that in evidence. Now, we are getting a lot of words in this case, none of which point out to any specific ground recognized in law as a ground for impeachment of a witness. This man has testified only that he heard him talking about administering or not administering an oath. He doesn't know anything about it. The fact that he discussed his testimony with somebody else has no reflection on his credibility; and the most it would be, would be a violation of a warning given to him by the Law Officer which would subject him to possible contempt of court action. This is an example of the continued fairly sharp practices we have had from the defense counsel. I have put up with it because the stakes are high. But this is the low point of the entire trial."

Government counsel concede that some questions asked by the law officer were "objectionable." They also concede that some of his remarks were "ill fitted to the occasion." However they contend that a consideration of "all" the law officer's questions and comments demonstrate that the board of review's conclusion of partisan advocacy on his part is wholly unjustified.

A similar situation was recently before us in United States v Bishop, 11 USCMA 117, 28 CMR 341. There an examination of the trial proceedings showed that the law officer merely tried to clarify certain doubts and uncertainties both he and the court members entertained. Some questions and some of the language contained in other questions were unsuited to the law officer's position and purpose, but the substance of his actions, in relation to the trial situation, did not stamp him as partial. Here, the Government admits that the challenged questions and remarks "present to the uninformed the spectre of partiality." However, the image of partiality does not disappear when considered in the light of the record. What the Court of Appeals for the Fifth Circuit said in Hunter v United States, 62 F2d 217, 220 (1932), in regard to examination of the accused by the trial judge may appropriately be repeated here:

> ". . . While that method of cross-examination, if it had been conducted by the district attorney, might have been proper, a district judge ought never to assume the role of a prosecuting attorney and lend the weight of his great influence to the side of the government. It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it, in the interests of justice, that the case is fairly tried. . . . It is too much to expect of human nature that a judge can actively and vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial."

Comments such as those made by the law officer in this case have frequently been held to be ground for reversal. Thus, in Kraft v United States, 238 F2d 784, 801 (CA8th Cir) (1956), the Court of Appeals criticized the trial judge for accusing defense counsel of "pettifoggery." It said:

> "The trial court could scarcely have used language more apt to bring the attorney here involved into contempt before the jury than to charge him with 'pettifoggery'."

We answer the certified question in the affirmative, and affirm the decision of the board of review.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

In my opinion, it is a close question whether the law officer's cross-examination and comments exceeded the bounds of judicial discretion. The principal opinion extracts certain questions and answers and, while that method of presentation is acceptable, the selection can cast the incidents in a light most unfavorable to the questioner. Without attempting to present the aspect favorable to the law officer, I point out that the reason for the examination was that the accused testified he did not read the confession which was executed by him. He did, however, testify that certain parts were true. Any reasonable person would have looked at the testimony with a jaundiced eye, for much of the information had to be furnished by the accused and he had executed an affidavit which stated the document had been read by him, he signed it in two places, he initialed all pages and some nineteen corrections thereon. But, regardless of the skepticism of the law officer, his questioning should not have been of such a character as to cast him in the role of a prosecutor. Trial counsel had already covered the area, and certainly the law officer, by repeating the performance and expressing his confusion about accused's testimony, cast the weight of his official position on the side of the Government. When the entire background and cross-examination is considered, I get the distinct impression that the law officer was using his authority in such a way as to impress the court members that the accused was simply not telling the truth. However, conceding judicial indiscretion, the difficult problem I encounter is to find any prejudice to the accused, for it is not unreasonable to conclude that the law officer was merely exaggerating the

obvious. However, I join my brothers because, when the robe of advocacy for the prosecution is worn by a law officer, that alone may be sufficient to tilt the scales of justice against the accused.

The incident concerning the law officer's comment to defense counsel was untimely. It was said under an apparent misapprehension of the purpose of defense counsel and in the heat of an argument over a possible irregularity by the law officer. Immediately thereafter the law officer declared a recess for an out-of-court conference and he opened that conference by saying, "Before we get into hard feelings about this, I thought we'd have an out-of-court hearing to discuss it." After the defense counsel, trial counsel, and the law officer had explained their theories and the matter was fully discussed, the atmosphere cleared and the court was reconvened. At that time the law officer failed to make any explanation to the court or retract his previous comments. All he did was to order the evidence stricken. That ruling unexplained would create the impression that his comment in the first instance was in all respects justifiable and that the evidence was stricken because defense counsel had used sharp practices. Certainly that would place the defense at a disadvantage with the court.

Accordingly, I join in affirming the decision of the board of review.