UNITED STATES, Appellant

v

GLENN J. LINDSAY, Recruit, U. S. Army, Appellee

12 USCMA 235, 30 CMR 235

No. 14,536

Decided March 17, 1961

*First Lieutenant Carl F. Wrench* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy*.

*First Lieutenant Burnett H. Radosh* argued the cause for Appellee, Accused. With him on the brief were *Colonel Harley A. Lanning* and *Lieutenant Colonel W. H. Blackmarr*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A board of review reversed the accused's conviction for indecent assault because it concluded that a single question asked by the law officer placed him "in the position of assisting the prosecution." It also indicated that if it had to review the sentence it would, "in the interest of justice," direct a rehearing because the convening authority had dismissed a charge of rape on which the court-martial had returned findings of guilty. The Judge Advocate General asked this Court to review the board of review's decision on both points. The certified questions are as follows:

"1. WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE QUESTION OF THE LAW OFFICER, REGARDING THE POLICE STATION SIGN, CONSTITUTED PREJUDICIAL ERROR?

"2. WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE CONVENING AUTHORITY HAD NO POWER TO AFFIRM A SENTENCE FOR THE INDECENT ASSAULT AFTER HE HAD DIS-

**237**

APPROVED THE FINDING OF GUILTY OF RAPE?

According to evidence presented by the Government, Mrs. Rita Traenkner was a waitress in a gasthaus in Windsheim, Germany, frequented by local inhabitants and American military personnel. Principally, she attended to customers in a side room, which was separated from the main room by a hallway. On the evening in question, about 11:30 p.m., all the customers had departed from the side room and Mrs. Traenkner prepared to close it for the night. She had turned off the juke box and was placing the chairs on the table tops when the accused entered. He closed the door to the hallway and asked her to dance. Mrs. Traenkner declined, remarking that she "had to clean up." Thereupon, the accused struck her on the face, and committed the acts alleged in the specification. Mr. and Mrs. Fiebranz, the owners of the gasthaus who were in the main room, heard screams. They proceeded to the hallway. The accused was seen coming out. Through the open doorway, Mr. Fiebranz saw Mrs. Traenkner's "face and clothing . . . [were] bloody." He attempted to restrain the accused, but let him go when the accused "reached into the inside pocket of his overcoat." The accused ran out and Mr. Fiebranz hurried after him. About six blocks away, the accused entered a German police station. There, it was observed that the fly of the accused's trousers was half open; he was very excited and he "tried several times to leave the station." Eventually, the accused was turned over to American military police. Mrs. Fiebranz testified that when she entered the side room she found Mrs. Traenkner crying; the side of her face was swollen; her nose and blouse were covered with blood; she was at "her nerves end" and hardly able to talk.

The accused admitted he struck Mrs. Traenkner, but his account of the incident was vastly different from that of the prosecution witnesses. He testified he had arrived in the area about four days before the incident, and while most military personnel there had a 12 o'clock curfew, he had no "bed check" and could stay out longer. After the other military personnel and a girl to whom he had been talking had left, the accused returned to his "original table" in the side room to finish his drink. The waitress, who was not a "special friend" of his and whom he had seen only twice before, came up to him and asked for money for the juke box. He gave her some, and she inserted it in the box. She sat down at his table. Suddenly she "got right back up and said something . . . [he didn't understand] and hit . . . [him]." Although the accused was "quite a bit bigger" than Mrs. Traenkner, who, he admitted, was "fairly small," he promptly "hit her back." Mrs. Traenkner then tried to hit him with a chair; he pushed her and she fell back on a bench. As the chair fell to the floor, other people came into the room. Mrs. Traenkner "screamed . . . in English, not German," that the accused had "tried to rape her." Mr. Fiebranz told him not to "go anywhere," but he said he was going to the German police. And he did.

The question that troubled the board of review concerns the police station. A police officer who was standing across the street from the station at the time testified as a Government witness. He said the accused came down the street; came "to a standstill in front of the entrance of the police station and then went in." On cross-examination defense counsel elicited the fact that outside the station was a "big lighted sign with the word 'Landpolizei'" (Provincial Police), which could be seen by persons approaching the building and that there was another large sign with the same word on the door leading into the station. At the conclusion of the witness' examination by counsel, the law officer indicated he had a question to ask. What followed is set out below:

"Questions by the law officer:

"Q Could the police station sign be mistaken for a gasthaus sign by a person who cannot read German, is the shape similar?

"A To my opinion, yes.

"LO: Any questions by trial or defense counsel?

238

"DC: I have one question, this relates to yours.

. . . . .

"Questions by defense counsel:

"Q Don't most Americans know what Landpolizei means?

"TC: I object to that question.

"LO: Well, if he knows, he may answer.

"A If they have been sufficiently long in Germany, yes, I believe yes.

"DC: No further questions."

Unquestionably the question asked by the law officer is improper. Among other things it assumes, ■■■■■ without support in the evidence, the witness' familiarity with gasthaus signs in the area, and it calls for an opinion on a matter which requires no special expertise. See United States v Adkins, 5 USCMA 492, 18 CMR 116. The fact that the question is objectionable, however, does not necessarily mean the accused was prejudiced by either the question or the answer. It only marks the beginning of the inquiry. Ultimately, we must determine whether the mere asking of the question leaves one with the conviction that the law officer was biased and an advocate for the prosecution; or whether there is a fair risk that the question alone, or in conjunction with the answer, influenced the findings of the court-martial.

The first alternative needs little discussion. It is, of course, well-settled that the law officer is no ■■■■■ mere figurehead. He can ■■■■■ ask questions to clear up ■■■■■ uncertainties in the evidence and develop the facts for the better understanding of the court-martial. Asking a question which is "more likely to be asked by the prosecuting attorney than defense counsel" does not usually make the law officer a Government advocate. United States v Bishop, 11 USCMA 117, 28 CMR 341. The question must be considered in the light of the surrounding circumstances. Here, the existence of the sign was brought out by the defense

through cross-examination of a prosecution witness. At that point in the development of the evidence, it was not illogical to suppose that the accused might have gone into the police station because he mistook the nature of the sign. Questions as to size and shape, and the letters and lighting of the sign were, therefore, not inappropriate. The difficulty, however, was that the law officer attempted to · cover too much ground in one question. Be that as it may, the purpose of the question, and the state of the evidence, do not show that the law officer was biased against the accused or predisposed toward the prosecution. In fact, while the board of review does indeed speak of the law officer as "assisting the prosecution," the real basis of its decision appears to be its conviction that the question and the witness' answer raised a "new theory" which had no foundation in the evidence and which might "have been the deciding factor as to whether . . . [the court-martial] believe[d] the story of the accused or of the alleged victim." That brings us to the second aspect of the inquiry; namely, is there a fair risk that the accused was prejudiced by the question? In our opinion, there is no fair risk of prejudice.

One of the major points of attack on the law officer's question is appellate defense counsel's contention that it called upon the accused to prove that he could read German and that he was not, therefore, misled by the sign. Assuming the question actually ■■■■■ implies that the accused could not read German and did not know the meaning of the word "Landpolizei," the implication was later completely dispelled by the evidence. Thus, the witness' answer indicated that persons who had been in Germany "sufficiently long" would know the meaning of the word. The accused's testimony showed he had been in Germany at least since November 2, 1959, some three months before the incident. Further, it appears that as a result of his duties as a truck driver, he knew specifically the location of the police station in Windsheim, and that he purposely went to the station, six blocks from the gasthaus, to report the inci-

dent. His testimony on that point, in direct examination, is as follows:

"Q [Defense counsel] Let's go back, then, to where she said that you had raped her, what did you do then?

"A Mrs. Fiebranz, she came up to me and asked me what happened. After she had told them I had tried to rape her, he told me, 'Don't go anywhere,' and I said, 'I'm going to the German police,' and I left the gasthaus.

"Q Where did you go?

"A. To the German police, sir.

"Q How did you know it was the German Police Station?

"A Well, I go to Illesheim, Windsheim, going on truck routes, every day, and stuff like that, I'm a truck driver.

"Q Did you know where this police station was?

"A Yes, sir.

"Q Are there any signs on the police station?

"A Yes sir.

"Q What signs are there?

"A They have one right in front of the police department says Land Police.

"Q What kind of a sign is this?

"A Sir, it's a sign, I'd say about this long, sir, and it's written in five inch letters, says 'Land Police', that's on the front entrance as you go in, you make a left turn, and the office is on the left there, says 'Land Police' too.

"Q Did you say an office on the left says 'Land Polizei' too?

"A Yes, sir.

"Q Is that the room you went in?

"A Yes, sir.

"Q Why did you go to the police station?

"A Because after she said, 'He tried to rape me,' and this German told me not to go anywhere, I didn't know what they was trying to do, so I just left.

"Q What did you do while in the police station?

"A I tried to tell a German what happened. They couldn't understand me, so I told them to call the MP's, and they understood 'MP' so they called but they never did arrive."

Other evidence shows that the entranceway to the station from the street led to other areas, and that entry to the police office itself required going up several stairs. This evidence and that set out above leave no doubt that the accused knew the nature of the premises he entered. Certainly, counsel for both parties had no doubt that the accused entered the station knowing what it was in fact. There is no mention whatever of possible mistake in their closing arguments. Trial counsel contended the accused went into the police station because it was the first open entranceway he found; defense counsel maintained he entered for the express purpose of reporting the incident. In our opinion, the court-martial, as well as counsel, paid no attention to the implications of the law officer's question—a question asked early on the first day of a trial which lasted three days. We conclude, therefore, that the accused was not prejudiced by the law officer's error. Consequently, we answer the first certified question in the negative.

Appellate defense counsel contend the second certified question is not one of sentence power, as stated in the question, but rather one of sentence discretion. They maintain the board of review did not hold that the convening authority lacked the power to reassess the sentence after setting aside the findings of guilty of the major charge, but merely that, in the interest of justice, it was appropriate to direct a rehearing on the sentence.[1] In particular, they rely upon United States v Middleton, 12 USCMA 54, 60, 30 CMR 54, where, in language substantially similar to that used by the board of review below, we said:

". . . Here, the period of confine-

[1] In their thorough brief, appellate defense counsel have compiled a large number of cases dealing with this matter. See United States v Swanson, 9 USCMA 711, 26 CMR 491; United States v Guy, 8 USCMA 66, 23 CMR 290; United States v Oakley, 7 USCMA 733, 23 CMR 197.

ment was one of the essential matters for the court-martial's consideration. The great disparity between the permissible period of confinement and the period instructed upon, and the relative shortness of the former, present a fair risk that the error influenced the court-martial's decision. The same circumstances indicate that a rehearing on the sentence should be had in the interest of justice. United States v Oakley, 7 USCMA 733, 23 CMR 197; cf. United States v Green, 9 USCMA 728, 26 CMR 508."

Since the board of review had directed a rehearing of the entire case, its comments on the propriety of a rehearing on the sentence were obviously dicta and conditional.[2] A ruling on a purely suppositious situation is ordinarily not subject to review. United States v Harris, 10 USCMA 69, 27 CMR 143. However, we need not ascertain the exact meaning of the language of the board of review. Suffice it to say in answer to the certified question that under the Uniform Code of Military Justice when an appellate tribunal sets aside some findings of guilty and affirms others, it has the power, and the discretion, to determine whether to direct a rehearing on the sentence by a court-martial or to reassess the sentence itself. Cf. United States v Marymont, 11 USCMA 745, 29 CMR 561; United States v Swanson, supra.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for submission to a board of review for further proceedings consistent with this opinion.

LATIMER, Judge (concurring in the result):

While generally I am not in disagreement with my associates regarding the first issue certified to this Court by The Judge Advocate General of the Army, I prefer to make my position clear on the authority of a law officer to question witnesses. Here in a full-scale trial on two serious offenses, only one question of little consequence was asked of a Government witness. In spite of this limited participation, the board of review's decision and the Chief Judge's opinion are susceptible of the interpretation that if an answer to a question is not favorable to an accused, the law officer commits prejudicial error because he joins the prosecution. I know of no law or decided case which so circumscribes him or any judge of other Federal courts. He is not a robot who is hemmed in to move only in one direction and if during the trial of a case there are areas of uncertainty which when probed will develop the truth, he is within his powers to bring out facts bearing on the issues, regardless of which party may be helped or harmed. Obviously, any question asked by him ought to have some influence on the findings; otherwise it would be objectionable upon the grounds of immateriality. Accordingly, it would follow that if by this holding my associates imply that a law officer may not propose questions to witnesses which seem essential to a full development of the case, regardless of which party is affected, then they truly make a figurehead out of him. Moreover, I reject the principle advanced by the board of review that because his interrogation suggested a theory not otherwise developed by the prosecution he becomes a partisan advocate for the Government. If that were a proper test I suggest he would be bound to remain strictly within limits marked out by the defense and instead of guiding the trial must only follow the dictates of defense counsel.

In United States v Berry, 6 USCMA 638, 20 CMR 354, I cited with approval several Court of Appeals cases dealing with the authority of a judge to interrogate witnesses. All recognize his right to examine witnesses and a reading of them will point up the nature of the conduct of the judge which transcended the bounds of propriety. The trial judge's conduct portrayed by those authorities shows a partisan advocacy which could not help but impress the

[2] "If it were not for our disposition of this appeal on the basis of the third assigned error," the board of review said, "we would feel constrained to order a rehearing on the sentence."

jury with the belief that the judge was intent upon fixing the guilt of the accused. I find no such injudicious behavior in this record.

The second issue before us arises out of an anticipatory bit of unsound reasoning found in the decision by the board of review, and I deem it desirable to set forth its rationalizations in full:

"If it were not for our disposition of this appeal on the basis of the third assigned error, *we would feel constrained to order a rehearing on the sentence.* In our opinion the severity of the sentence adjudged can but indicate that the court gave weight only to the rape charge. *The approval by the convening authority of a sentence which included only one year less than the maximum authorized for the indecent assault charge after the disapproval of the findings of guilty of the rape charge was, in our opinion, an adjudging of sentence by the convening authority rather than a reassessment of the sentence. Because of the great disparity in the punishment for the two offenses, there simply was no basis for the attempted apportionment by the convening authority.* In the interests of fairness and justice to the accused we are of the opinion that any sentence for the indecent assault charge should have been determined free from any consideration of the dismissed rape charge. This could have been done at a rehearing on sentence ordered at the trial level" [Emphasis supplied.]

Obviously those comments show the board was hypothesizing. Nevertheless, because we are reversing the decision of the board and reinstating the findings, and the board may act further under a misinterpretation of the law, it is desirable that our views be expressed in order to avoid unnecessary steps in the appellate processes. And, unlike my associates, I not only believe we should reach the second issue, but ought to face up to it squarely and give an explicit answer in order to provide some obviously needed guidance upon our remand.

Pretermitting the powers of this Court and for present purposes, I am not disposed to disagree with the Chief Judge's generalization that "when an appellate tribunal sets aside some findings of guilty and affirms others, it has the power, and the discretion, to determine whether to direct a rehearing on the sentence by a court-martial or to reassess the sentence itself." That, however, completely ignores the issue propounded to us and the emphasized language of the above-quoted paragraph. Although the defense denies that the board of review indicated the convening authority lacked power to reassess accused's punishment and asserts the board merely directed a rehearing on sentence to further the interests of justice, I just cannot interpret its opinion to so hold. To the contrary, the plain words used by the members of the board of review demonstrate that they felt "constrained" to order a rehearing because the convening authority's action was "an adjudging . . . rather than a reassessment of the sentence," and that there "simply was no basis for the attempted apportionment by the convening authority." In my view, clearer language to convey a conclusion that the convening authority erred as a matter of law would be difficult to compose. And the error of such a holding is easily demonstrated by reference to the decision of the United States Supreme Court in Jackson v Taylor, 353 US 569, 1 L ed 2d 1045, 77 S Ct 1027 (1957). There the Court was faced with an argument almost identical to the language used by this board of review and categorically rejected it.

The short answer to this question is that, while we have held reviewing authorities may order a rehearing on sentence, we have never said flatly that they were powerless to reassess punishment under circumstances of this kind. Moreover, I find no good reason why justice is not well served when the power is exercised. Surely it is better that the board of review determine an appropriate sentence for the offense affirmed rather than to toss the case back and forth to be faced with the same determination at a later date. In suggesting that giving a substantial reduction is adjudging and not reassessing, the board was indulging in an

unnecessary and unrealistic distinction. And I hasten to point out that such is not necessary, for a board is not without power to protect an accused from what it deems to be too onerous a penalty. Beyond question, a board could—and indeed should—if it feels the sentence to be inappropriate, reassess and reduce it. I suppose a board could, in its discretion and at a proper time, order a rehearing on sentence rather than itself reassessing if the members concluded they could not fairly make a proper determination. But that situation ought seldom to arise. In that connection, it is to be remembered that the court-martial which heard the original case may not be reassembled, the hearing must be on the record, the board of review members are experienced in the sentencing field, usually they have the benefit of much information not available to the court-martial, and unless an accused has been denied the right to present evidence in extenuation and mitigation, they ought to be in a preferred position to make a fair assessment of the quantum of punishment. On a rehearing there would be no change in the findings affirmed by the convening authority, and the board is faced with the same decision. So far as I am able to ascertain, the reason motivating the board to grant a rehearing in this case must find its source in a belief that the court-martial would impose a sentence less onerous than the one affirmed by the convening authority. Conceding that possibility, the board could make certain that situation would not occur, for it can reduce any or all parts of this sentence to a point where no reasonable court would go lower. Why, then, put off until later that which can be done

today? But, at best, rehearings on sentence are discretionary actions by a board of review, whereas under the decision certified to this Court the board members indicated that the suppositious relief they would accord to accused was required by law. That indication is contrary to the Code and our decided cases, and silence on our part may cause the board to believe that its rationalization bears our imprimatur.

For the foregoing reasons, I would also answer the second certified issue in the negative and remand the case to a board of review for further action not inconsistent with the law.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I agree with the Chief Judge that the first certified question must be answered in the negative. I desire, however, to disassociate myself from that portion of my brothers' opinions which purport to answer the second certified question. As the Chief Judge notes, the comments of the board of review on the propriety of a rehearing on the sentence "were obviously dicta and conditional." Hence, the issue presented is hypothetical, and no answer to the question is due. United States v Bedgood, 12 USCMA 16, 30 CMR 16; United States v Armbruster, 11 USCMA 596, 29 CMR 412; United States v Storey, 9 USCMA 162, 25 CMR 424; United States v Fisher, 7 USCMA 270, 22 CMR 60. Accordingly, I join only in the reply to the first certified question and the reversal of the decision of the board of review.