UNITED STATES, Appellee

v

MICHAEL A. POSEY, Lance Corporal, U. S. Marine Corps, Appellant

21 USCMA 188, 44 CMR 242

No. 24,254

February 18, 1972

*Lieutenant David A. Monaco*, JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Commander Maitland G. Freed*, JAGC, USN.

*Lieutenant James R. Lamb*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.*, JAGC, USN.

### Opinion of the Court

QUINN, Judge:

The accused contends that the trial judge abandoned his impartiality during sentence proceedings and became disqualified to impose sentence.

Electing trial by a general court-martial composed of a military judge without court members and convened at the Marine Corps Base, Camp Lejeune, North Carolina, the accused pleaded guilty to three specifications alleging possession of lysergic acid diethylamide (LSD) contrary to Article 1270, Navy Regulations, and to one specification charging wrongful possession of .40 grams of marihuana, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively.[1] During the inquiry into his understanding of the elements of the offenses and the meaning and consequences of a plea of guilty, the trial judge asked the accused a number of questions as to the source of the sub-

stances, their cost, and the interest of others in them. The accused, sometimes after conferring with defense counsel, consistently declined comment. In each instance, the trial judge apparently recognized the right of the accused to refuse to answer the questions, which were unrelated to the substance of the standard inquiry into the voluntariness and providence of a plea of guilty. See United States v Care, 18 USCMA 535, 40 CMR 247 (1969). However, during the sentence proceedings, the judge recognized no such right of silence.

The sentence proceedings began routinely with the presentation of evidence of two previous Article 15 punishments for violations of Article 86, Code, supra. One of the punishments was administered in March 1969, when the accused was serving in Vietnam; the other was imposed at Camp Lejeune in late 1969. Several officers testified for the accused. Captain Montford had had the accused as a student in his class on political science in the extension division of East Carolina University, which was con-

---

[1] Some of the specifications were later determined to be multiplicious for the purpose of sentence.

ducted at Camp Lejeune. He regarded the accused as a "very good student," ranking him fourth in a class of 35. He believed that the accused's involvement with the prohibited substances in the case was "out of character with him," and he suggested it was a "onetime thing." First Lieutenant Guins testified that the accused had served as his combat platoon radioman in Vietnam. He could "always count" on the accused, and he had recommended proficiency and conduct marks for him that he reserved for "an exceptional individual." Although marihuana was "real easy to obtain" in Vietnam, Lieutenant Guins had never known the accused to have "fooled around" with it "or any type drugs." Major Cook was the S-4 Officer of Marine Corps Service Support Schools at the base. The accused was a clerk in his office for about six months. From the very beginning, the accused had "impressed" Major Cook with his attitude, neatness, and capability. Of the "dozen or so" persons who had served him in a similar capacity, the Major "would say . . . [the accused] was either the best or the second best."

Testifying in his own behalf, the accused reviewed his civilian and military background, which included the award of a Purple Heart medal for wounds sustained in combat in Vietnam. He also reviewed his previous misconduct, noting that the first Article 15 resulted from neglect in returning to his unit after treatment for malaria aboard the hospital ship Repose; and that the second came about when all the students in a class on military subjects were charged with failing to be at their appointed place of duty when they left because the instructor did not appear; actually, he was late. The accused explained how he became involved with marihuana and LSD. He testified that in July, his wife went to stay with her mother for an extended period. He became friendly with a "couple of Marines" who were using drugs. He talked with them "quite a bit" about drugs, and "decided . . . [he] would like to try it just to see what it was like

for . . . [his] own personal experience." Although he acknowledged "control" of all the LSD tablets charged to his possession, he maintained that only five belonged "personally" to him. He confessed that he had "made a big mistake." He wanted to return to college after his tour of duty in the Marine Corps, which he did not want to end in a punitive discharge. During cross-examination, he admitted that during the period of his "experimentation" between July and September, he had used LSD and marihuana on "three to five occasions."

After both defense and trial counsel had concluded their questioning of the accused, the trial judge asked trial counsel "to develop some areas" of inquiry. See Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 149$b$(3). During the next three hours, the accused was subjected to what can best be described as an inquisition into his knowledge of sources of supply of the prohibited substances, their cost, the physical description of persons with whom he had had contact, and the smallest details of his association with the two Marines with whom he had become involved. Whenever trial counsel faltered in his questioning or digressed from a line of inquiry the trial judge did not want to leave, the judge assisted counsel or redirected him. From time to time, the judge disregarded the adopted procedure to question the accused directly. With one exception, objections by defense counsel on a variety of grounds were uniformly overruled.

Although the questioning was in form mostly that of trial counsel, a reading of the record compels the conclusion that the actual scope and content of the examination must be attributed to the trial judge. The propriety of the examination must be measured, therefore, by the standard of impartiality expected of a judge, rather than by the broader boundaries of partisan advocacy. Acknowledging this personal identification of the

190

judge with the examination, the Court of Military Review concluded there was no "abuse of discretion" by him.

The Court of Military Review regarded the long and detailed examination as simply indicative of the trial judge's "genuine and judicial interest in how a young man of . . . [the accused's] considerable promise became involved with drugs." We perceive a different interest. The examination impresses us as a peevish reaction to the accused's refusal during the inquiry into the providence and voluntariness of his plea to comment on matters that the judge was interested in. The issue, however, is not the motivation of the inquiry but its content and consequences. As to that, we perceive no necessity for knowing, as the trial judge insisted on knowing, the hair color and the eye color of the person who sold LSD to the accused. Similarly, we perceive no necessity for knowing, as the trial judge insisted on knowing, what areas in Atlanta, Georgia, were areas of drug availability. Two incidents that occurred in the course of the interrogation emphasize that the trial judge was less interested in eliciting information calculated to help him arrive at a fair sentence for the accused than in ferreting out matter that might justify the imposition of a more severe sentence.

About halfway through the examination, the questioning was directed to details of the purchase of the LSD tablets found in the accused's possession. The judge's interjections were frequent, and apparently the accused became impatient, perhaps even annoyed, at what must have seemed to him, as it does to us, to be a pointless interest in minutiae of the transaction. He made some sort of motion and a sound. The judge immediately instructed the reporter to have the record reflect "that the accused moved in his chair and gave what . . . [he] would call a huffing sound." The judge called upon defense and trial counsel to confirm his description of the sound; and both did. Later, toward the end of the uninterrupted three-hour period of examination, the accused again reacted to a seemingly pointless question. This time the purpose of the questioning was to determine why he had placed 11 LSD tabs in his suitcase on the morning of the apprehension. Again, the judge had been interjecting demands that trial counsel ask particular questions. And again, the accused made some motion. The motion was described for the record by the trial judge as follows: "[T]he accused in responding . . . moved back in the chair and bent his back and put both hands out in gesturing without making an oral statement before he commenced to orally respond." Once more the judge took pains to ascertain that counsel had no objection to his "description." By itself, the description can be construed to indicate that the accused's gesture was one of despair at the nature or the length of the questioning on the particular point, but in context of the earlier incident and the total examination, it is clear that the judge regarded the accused's movement as a protest and, therefore, a matter to be counted against him.

It is the responsibility of the trial judge to protect a witness, including the accused, against questioning which has the effect "merely to harass, annoy, or humiliate him." Manual, supra, paragraph 149b (1), page 27–54. The judge abandoned that responsibility here. His directions to trial counsel and his own questioning extended the examination beyond any reasonable limit. And, his direction of the examination effectively prevents fair appellate consideration of the legal correctness of his rulings on the defense objections. See United States v McGary, 9 USCMA 244, 26 CMR 24 (1958). His comments on the accused's physical movements are more the remarks of a prosecutor intent on disparaging the accused than those of a judge concerned with proper questions and responsive answers calculated to obtain information helpful to determination of a just sentence. See United States v Lowe, 11 USCMA 515, 29 CMR 331 (1960). With regret, but

conviction, we conclude that the trial judge was more prosecutor than judge, and he should not have imposed sentence upon the accused.

The decision of the United States Navy Court of Military Review as to the sentence is reversed. A rehearing on the sentence may be ordered.

Chief Judge DARDEN concurs.

DUNCAN, Judge (concurring):

My purpose in expressing what follows is to make my views in this area clear. I am able to join the majority in concluding as a matter of law that the military judge abandoned his impartiality. He displayed proclivity toward discovery of minute details of incidents of uncharged conduct more akin to the interest of an investigator concerned with apprehension and prosecution than dedication to the imposition of sentence with dispassion.

Of all decisions a judge must make, those which concern sentencing a convicted accused are most agonizing. In order to perform this obligation, a judge has broad discretion to collect information relevant to an enlightened determination. In the instant case the judge's exhibited bent for bizzare, irrelevant, and extraneous details sufficiently serves to persuade me that his discretion was abused.

In order to reach this conclusion, I believe it germane to assign a number of legal principles to proper legal grooves.

In the case at bar the accused entered guilty pleas and there were no court members. The Government urges that it can be assumed that the judge has culled the impermissible information from that properly usable, and, hence, there is no error, citing the case United States v Montgomery, 20 USCMA 35, 42 CMR 227 (1970). Obviously a strong presumption exists that a judge experienced in the law will disregard improper evidence or argument, but the genesis of the presumption is assumed impartiality. Upon a finding of prejudice on the part of a judge the presumption vanishes. The chance that the abandonment of impartiality permeates personal judgment is so great that it would be grossly unreasonable to presume such a mental attitude can be disregarded at the moment of sentence.

The accused herein could have been sentenced to dishonorable discharge, confinement at hard labor for seven years, total forfeitures, and reduction to pay grade E–1. The accused was sentenced to a bad-conduct discharge, confinement at hard labor for twenty months, total forfeitures, and reduction to pay grade E–1. The accused does not contend that the sentence is legally inappropriate. Furthermore, there is no claim of want of jurisdiction.

I deem it proper to hold that even though there is *no finding* that the sentence is inappropriate or erroneous, in order to comport with fundamental fairness, the accused must be granted a rehearing on the sentence. A sentence by a partial judge is so grievous to a fair and well ordered system of justice that it should be made clear that upon a finding of partiality by sufficient evidence, a rehearing on sentence will be ordered. Respect for and confidence in the system of military justice can only be maintained by the avoidance of partiality or the appearance of partiality of a military judge. As I view it, such a situation is a classic example of gross ill that must be cured by an extremely firm curative effort directed against it.