UNITED STATES, Appellee

v

ROBERT E. KIMBLE, Private, U. S. Marine Corps, Appellant

No. 28,313

December 20, 1974

*Lieutenant Commander Jeffrey H. Bogart,* JAGC, USN, argued the cause for Appellant, Accused.

*Captain Joseph W. Diver,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel G. L. Bailey,* USMC, and *Lieutenant Colonel P. N. Kress,* USMC.

## OPINION OF THE COURT

Cook, Judge:

Upon trial by a general court-martial, the appellant was found guilty of one count of robbery and sentenced to a dishonorable discharge, total forfeitures, and 3 years' confinement at hard labor. Intermediate reviewing authorities have approved and affirmed the findings and sentence, and the case is before us on a single issue. It is urged on behalf of appellant that the military judge improperly became an advocate for the prosecution, as demonstrated by his examination of the appellant at trial.

In proving the robbery charge, the prosecution's evidence showed that on

the evening of December 13–14, 1972, the appellant, with three other Marines, left Camp Pendleton Marine Base and drove to Oceanside, California. After dropping off some laundry, the four men rode around the area and, during the time, made several stops to eat and drink. In addition, they purchased wine, vodka and some beer, which was also imbibed by them. While at the Greyhound Bus Terminal in Oceanside, they met the eventual victim, Private First Class Lloyd, who was haggling about a taxi fare to Camp Pendleton. As a result, one of the Marines, Private First Class Smith, then offered Lloyd a ride with them back to camp which he accepted. Before returning to Camp Pendleton, however, they proceeded to a gas station where Lloyd cashed two travelers checks in order to pay for fuel. Several more stops were made, including one at a club where Lloyd, Smith and the accused ordered drinks. Sometime after midnight, they returned to the base. Once there and as they were proceeding along a deserted road, Smith suggested the car be stopped so they could relieve themselves. After stopping, the driver remained in the vehicle but the accused, Lloyd and Smith got out.[1] While outside the car, the victim, Smith and the accused were standing beside each other in that order with the victim on the extreme left. Suddenly the victim was struck in the left eye and received a second blow to the back of his head. Although unable to identify who struck him, the victim did say he next heard a voice remark "his wallet, we'll take his wallet." Immediately thereafter, a car door slammed and the vehicle drove off. Lloyd staggered to his feet and then was able to wave down a military police vehicle that passed the scene a few moments later. He reported what had occurred. After he got into the police vehicle and a radio report of the incident was made to the authorities, they proceeded in the direction the other car had gone. They came upon the other car a short distance down the road where it had been stopped by another military police patrol car. As the military police approached the car, they observed that the accused had his hands in the glove compartment. After telling accused to remove his hands therefrom, the police found the victim's wallet in the compartment. The victim had indicated that he had funds in the wallet, but none were found. Otherwise, his identification and other papers were undisturbed.

The accused elected to testify on his own behalf. While generally agreeing with the facts as recounted by the victim and the other witnesses called by the Government, accused denied that he was involved or in any way participated in the robbery of the victim. According to him, while standing to the right of Smith, who in turn was to the right of the victim Lloyd, he turned around and noticed that the victim was lying on the ground with Smith standing over him. As he started toward the car Smith "told me to get his wallet" which he refused to do in a certain but obscene manner. Subsequently, he noticed the victim's wallet in Smith's hand and then Smith remarked "here, take the wallet," which accused admitted accepting. The accused agreed that the driver asked "what happened" but claimed that it was Smith who replied "nothing, just drive" and no one else said anything. Finally, on direct examination, accused denied knowing what had happened to the contents of the wallet, but conceded that he looked in the wallet after receiving it from Smith. He also said he did not see anything in the wallet and that there was no money in it, it was empty. On cross-examination by the prosecution, he recalled that the first thing he heard while outside the car was a "thud" and that he only heard it once. Upon hearing it, he said he turned to the right and saw the victim on the ground with Smith "leaning down over him." He explained that he turned to the "right" because of the way he was standing and claimed it was only a matter of seconds between hearing the thud, turning, and seeing Smith with the wallet in his hands. However, he denied that he saw Smith go into the victim's pocket to get the wallet. Furthermore, he could give no reason why

---

[1] The evidence is in conflict as to whether a fourth party, named Morman, who was with the group, also got out of the car.

he took the wallet when it was handed to him. Finally, he said that after he got back in the car he placed the wallet on the floorboard, where it stayed until they were stopped by the military police. Only after the military police pulled them over did he pick it up and put it in the glove compartment.

At the conclusion of the cross-examination and when defense counsel stated he had no redirect examination, the military judge then questioned accused. Although the questions and replies cover four pages of the record, which appellate counsel decries generally, the principal and only real basis for the assertion that the military judge became an advocate is founded on the following excerpts:

Q. Did you see him open the wallet and take anything from it?
A. I did not see him take any money from the wallet, sir. He had the wallet just like this sir, it wasn't closed, it was open. I did not see him take the money out of it, sir.

Q. Did you see him take the wallet from PFC Lloyd's pocket?
A. No, sir.

Q. It just appeared mysteriously, is that correct?
Wit: Sir?

Q. It just appeared mysteriously?
A. Sir, I don't know what you mean, sir.

Q. You saw Private First Class Smith standing over Lloyd, and then he had a wallet in his hands. Well, did you see how he got the wallet into his hands?
A. No, sir.

Q. It came out of nowhere, right?
A. Sir, I did not see him go into his pockets and got [sic] it, sir. All I saw was that he had it in his hands.

After the military judge referred to accused's vulgar and obscene refusal to take the wallet from the victim's pocket, which accused reaffirmed, the record shows the following:

Q. Now why did you tell him what you said?
A. Sir, I did not want to get involved, sir.

Q. But then you did take the wallet afterwards?
A. Yes, sir.

Q. Now did you think that that would involve you?
A. Yes, sir.

■ Concerning the matter of questioning by the trial judge and his role in the court-martial, this Court has repeatedly recognized that he is not a mere figurehead. Moreover, just as the prosecution of a crime is not a fox hunt, so also is the military judge not simply an umpire in a contest between the Government and accused. He can ask questions not only "to clear up uncertainties in the evidence" but also "to develop further the facts for the better understanding of the court members." *United States v Bishop,* 11 USCMA 117, 120, 28 CMR 341, 344 (1960). Indeed, as stated in *United States v Lindsay,* 12 USCMA 235, 239, 30 CMR 235, 239 (1961), relying on the *Bishop* opinion:

Asking a question which is *"more likely* to be asked by the prosecuting attorney than defense counsel" does not make the law officer [now called the military judge] a Government advocate. The question must be considered in the light of the surrounding circumstances. (Citation omitted.)

More recently, these views were reaffirmed in *United States v Clower,* 23 USCMA 15, 48 CMR 307 (1974). However, unlike the situation in *Clower,* the examination by counsel of the appellant in this case was neither thorough nor incisive. Both the direct and initial cross-examination consisted of a rehash of what had been presented during the Government's case-in-chief, with the only amplification being accused's denial of criminal complicity. Uncertainty and inconclusiveness were created by accused's testimony about the type or manner of delivering the blow or blows that disabled the victim, the asserted swiftness with which the completed crime occurred, and what accused did and did not see relative to the extraction of the victim's wallet from his pocket and possession. Consequently, the examination of accused by the military judge was proper and fitting.

In this light and turning our attention

to the first matter of which complaint is made by appellate defense counsel, namely, the reference to the *mysterious appearance* of the wallet, the examination immediately before is worthy of note. In response to the military judge, the accused testified that he had seen the victim on the ground with Smith standing over him; he saw nothing in Smith's hands—referring to a bottle or other blunt weapon—"except the wallet"; but, he again denied seeing Smith take the wallet out of the victim's pocket. Next, accused said that only seconds elapsed between the time he heard the "thud" and the time he turned around, but denied that Smith had the wallet in his hands at that time, notwithstanding his previous admission that he had seen nothing in Smith's hands when he turned "except the wallet." After this apparent conflict, accused continued with his version of the sequence of events. Upon being asked when he first saw the wallet in Smith's hands he replied "[w]hen I was going towards the car door," but then, in the same answer, added "[w]hen I was going towards the car door, PFC Smith said to get the wallet" and he refused. According to accused, he was handed the wallet about eight seconds later as he pulled the car door open. Again, however, appellant denied seeing Smith remove the wallet from the victim's pocket, at which point the military judge made his remark that "it just appeared mysteriously" and added "it came out of nowhere."

Concerning the second part of the questioning, which resulted in appellant's admission that he thought his eventual acceptance of the wallet did involve him, this too resulted from what had previously occurred. As shown by the record quoted hereinabove, appellant first said that he refused to take the wallet from the victim's pocket because he "did not want to get involved." Appellant's later acceptance of the item logically called for an explanation which, albeit, may have been contrary to his interest.

■■ Treating the complained-of questioning in both instances, however, in neither case does it support a finding of bias by the military judge. In the first instance, whatever be the characteriza-

tion of his remarks about the wallet "mysteriously appearing," either as sarcasm or skepticism, the record supports such expression as a normal reaction. Not only was appellant's testimony contradictory on material and relevant points, but also presented for consideration unsupported contentions. The second occurrence is equally without fault. Appellant himself made the exculpatory reference for his refusal to remove the wallet from the victim's pocket. His later admission of possible involvement by accepting the wallet when it was offered to him by Private First Class Smith resulted from a question that was required under the circumstances. Finally and worthy of note, is the fact that counsel for accused at trial did not object or complain to the total questioning or any part thereof. Thus, paraphrasing *United States v Lowe*,[2] the image of partiality disappears when considered in the light of the whole record of trial. Accordingly, the questioning by the military judge neither was improper nor did it reflect bias by him.

The decision of the Court of Military Review is affirmed.

Judge QUINN concurs.

FERGUSON, Senior Judge (concurring in the result):

Although I concur generally with the result reached in this case, I reluctantly must disassociate myself from some of the views herein expressed by my brethren. Although well aware that judges too are only human, I do not believe that a judge's intentional use of sarcasm or manifest skepticism, as apparently here employed by the trial judge when questioning this appellant, is ever justified or excusable.

The law is, of course, well-settled that a trial judge may properly ask questions of any witness, including an accused, in order to clear up uncertainties or develop facts for the better understanding of the court members. *United States v Bishop,* 11 USCMA 117, 28 CMR 341 (1960). When called upon to make a

_____
[2] 11 USCMA 515, 519, 29 CMR 331, 335 (1960).

determination of whether a trial judge has shed his cloak of impartiality to become an advocate for the prosecution by indulging in such questioning, however, an appellate court must look to the circumstances surrounding the inquiry, namely, the purpose of the questions and the state of evidence. *United States v Posey,* 21 USCMA 188, 44 CMR 242 (1972); *United States v Lindsay,* 12 USCMA 235, 30 CMR 235 (1961); *United States v Lowe,* 11 USCMA 515, 29 CMR 331 (1960); *United States v Bishop, supra; United States v Berry,* 6 USCMA 638, 20 CMR 354 (1956). The mere fact that these questions are subject to objection or sound like questions which normally would be asked by the prosecutor does not necessarily mean that a judge has abandoned his impartial role. The manner in which the trial judge has questioned a witness or an accused must rather convincingly demonstrate his biased advocacy of the prosecution's cause. *United States v Marshall,* 12 USCMA 117, 30 CMR 117 (1961).

Just last term, in *United States v Clower,* 23 USCMA 15, 48 CMR 307 (1974), we confronted precisely such a situation where a trial judge's questioning left no doubt concerning the impression of partiality he thereby created against the accused. While we noted, under the circumstances of that case, that the examination of the accused by counsel was both thorough and incisive and that it was, therefore, unnecessary for the judge to question him further, I do not believe that that factor by itself was in any way determinative. It was rather the manner in which the military judge there conducted his questioning, which we concluded to be akin to an impeachment of the accused, that led to our finding of plain error requiring reversal. Crucial to our holding in that case was our recognition of the great weight that a trial judge's influence may have upon the minds of the jury. In the words of Chief Judge Duncan, writing for a unanimous Court, it was there observed:[3]

Common among jurors is the pro-

pensity to attempt to tune in on and adopt a trial judge's appraisal of the facts. At trial a judge is a positive authority figure symbolizing the very best of the legal profession's relation to the maintenance of justice. Extreme caution must be observed to prevent a joinder of an exposure of a trial judge's view of the facts and a juror's natural curiosity about an affinity for that view from causing any abandonment of each juror's personal factfinding responsibility.

This concern over the impression of partiality which a trial judge may, even unwittingly, convey upon the triers of fact was also well recognized by the Advisory Committee on the Judge's Function of the American Bar Association when, in formulating the Standards Relating to the Function of the Trial Judge, it provided:[4]

The trial judge should not express or otherwise indicate to the jury his personal opinion whether the defendant is guilty or express an opinion that certain testimony is worthy or unworthy of belief.

These standards, as applied to trial judges in the military, are essentially the same. Paragraphs 39*b* and 54*b,* Manual for Courts-Martial, United States, 1969 (Rev.).

It is precisely for these reasons that I am unwilling to simply dismiss the readily apparent sarcasm and skepticism here employed by the military judge in his questioning of the accused as an expression of normal reaction supported by the record. In my view, a judge's use of such sarcasm and skepticism potentially creates, at least indirectly or inferentially, the very same impression of partiality upon the minds of the jury which we recently condemned in *Clower.* Even if the trial judge is "merely exaggerating the obvious . . . that alone may be sufficient to tilt the scales of justice against the accused." *United States v Lowe, supra* at 519–20, 29 CMR at 335–36 (Latimer, J., concurring).

As I examine the judge's inquiry of

---

[3] United States v Clower, 23 USCMA 15, 18, 48 CMR 307, 310 (1974).

[4] ABA Standards, The Function of the Trial Judge § 5.6(a) (1972).

this appellant as a whole, however, particularly in light of his later cautionary instruction to the jury to disregard any comment or statement made by him during the course of trial which may have indicated an opinion as to the guilt or innocence of the appellant, I am not convinced that there exists a fair risk of prejudice. Although some of the judge's questions during his somewhat lengthy inquiry of the appellant certainly covered facts previously elicited by opposing counsel, I also recognize that his examination developed facts not previously disclosed and cleared up uncertainties as to the time sequence of certain related events. With the exception of that portion of the trial judge's inquiry as set forth in the majority opinion, the remainder of his questions appear to be fair and impartial. Taken as a whole and in context, therefore, I do not believe that the trial judge's sarcasm and skepticism, as reflected in his questions to the appellant concerning the manner in which PFC Smith had obtained the wallet from the victim—a matter certainly not crucial to the appellant's defense of being merely an innocent bystander—had any direct bearing in tending to destroy the appellant's overall credibility. The same holds true, I believe, with respect to the judge's later questions dealing with the appellant's awareness of his involvement when he later received the wallet from PFC Smith.

Although I thus ultimately agree with my brothers in finding that the image of partiality disappears when considered in light of this entire record, I nevertheless wish to reiterate the caveat once earlier expressed by the United States Court of Appeals in *United States v Carmel,* 267 F2d 345, 350 (7th Cir 1959):

> We realize that an alert and capable judge at times feels that he can assist in developing the evidence by participating in the interrogation of witnesses. However, he would ordinarily do well to forego such intrusion upon the functions of counsel, thus maintaining the court's position of impartiality in the eyes of the ever-observant jurors.