UNITED STATES, Appellant,

v

JOSEPH W. BISHOP, Aviation Structural Mechanic, First Class, U. S. Navy, Appellee

11 USCMA 117, 28 CMR 341

No. 13,280

Decided January 8, 1960

■■■■■■■■■

*Major Ted H. Collins,* USMC, argued the cause for Appellant, United States.

*Lieutenant Colonel Remmel H. Dudley,* USMC, argued the cause for Appellee, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A divided board of review reversed the accused's conviction of a number of acts of sexual misconduct with his eleven-year-old stepdaughter. The Judge Advocate General of the Navy certified the record of trial to this Court for review on the following issue:

"Whether the Board of Review was correct in holding that the law officer erred to the prejudice of the accused in his questioning of the accused and of the victim's mother."

To prove the charges, the prosecution called the accused's stepdaughter as its only witness. After a preliminary hearing to establish the child's competency, she testified to the circumstances of the offenses. She described the accused's acts in a direct and explicit manner. On cross-examination, defense counsel developed several discrepancies between her trial testimony and her testimony at the pretrial investigation in regard to the place and specific date of one of the acts. The witness explained that immediately after the pretrial investigation she told the investigator in the case she "had made a mistake" as to the place. She indicated further that the mistake resulted from the fact that she was "scared" of the accused. Defense counsel also elicited testimony to the effect that she did not tell anyone about the incidents until about a "week or so" after the last act. At that time, she revealed them to her mother because she was "real mad" at the accused. The child also testified that she had remained silent previously because the accused had told her "not to tell." She acknowledged that she did not have a "happy home life." She did not "exactly hate" the accused, but she "used to help . . . [her] mother a lot" in the frequent fights the mother had with the accused.

The accused was the only witness for the defense. He unqualifiedly denied the charges. In the course of his examination, he said he had been married to the complainant's mother for four years. His marital life was "sort of up and down," with the "majority" of it being bad. He fought frequently with his wife and estimated that she had left him twelve times. He reviewed the details of some of his quarrels, separations, and reconciliations. He said that his stepdaughter was present on occasions of "physical violence" between his spouse and himself. His cross-examination by trial counsel was concerned primarily with his relations with his wife. He admitted that in one of the quarrels he pushed her so that she fell against a "steel door-jam" and as a result suffered a cut on her head which required thirty-seven stitches.

At the conclusion of the accused's cross-examination and after both trial and defense counsel indicated they had no further questions, the law officer examined the accused. This examination is set out below:

"LAW OFFICER: Bishop, before you leave, you have heard Donna tell her story and your story is diametrically opposed to that?

"A. Yes sir.

"LAW OFFICER: Also in your testimony, you have indicated some solicitude for the child. Specifically, one time you got some food for her and you went in to make sure she was covered. Those two occasions, anyway.

"A. On the occasion that I checked to see if she were covered, I was recalled from Midway.

"LAW OFFICER: I am not concerned with why you did it, but you did indicate some solicitude for the welfare of the child?

"A. I don't quite follow that word, sir.

"Q. You were interested in getting

**119**

her something to eat and on one occasion you made sure that she was covered in bed?

"A. Yes sir, there have been numerous instances on that.

"LAW OFFICER: Have you ever had occasion to discipline that child?

"A. Well sir, more or less I guess, but most of my discipline was when we would sit down at the table I used to tell her to sit down and eat and not to sit down and chatter.

"LAW OFFICER: Did you ever strike the child?

"A. Yes sir, I spanked her twice. Once upon returning from Japan in 1955, and once at Alameda I give [sic] her a couple of swats with my hand.

"LAW OFFICER: Could you give any reason she would make such allegations against you? This is some indication that she was not antagonistic toward you.

"A. I don't know sir, unless it is her mother put her up to it, sir."

When the law officer finished, trial counsel asked the usual questions as to whether the court desired to have any witnesses called or recalled. See Manual for Courts-Martial, United States, 1951, appendix 8a, page 517. The president of the court said that he "would like to have the mother called as a witness." He indicated he had no specific questions to ask her "at this point," but he was interested in knowing whether she "put the child up to this." The court recessed for the members to "discuss" whether to call the mother. Some minutes later court reconvened and the president gave the law officer a list of questions "to be asked of the mother." Mrs. Bishop was then called as a witness for the court and was interrogated by the law officer. Her direct examination and redirect examination cover just over five pages of the record. Summarized generally, the testimony is as follows: When the mother was alone with the child on December 10, the child disclosed to her certain acts committed by the accused on four occasions; she was "stunned and shocked"; she called the doctor and on his directions, she brought the youngster to him; later

she returned to the house to collect her clothes and that was "the last" she knew "of it." She said further she had been married to the defendant for four years. The relationship was not "normal" because the accused was "awfully jealous" of her, particularly when she was working and making more money than he. The accused also beat her "quite a bit." Their relationship "changed" between November 29, 1958, the date of the last offense and December 10th the date of disclosure by the daughter. She had the accused "brought" home on emergency leave because she thought her daughter had polio. When the accused arrived he did not "check," but "just . . . [went] home and got drunk." Two questions and answers merit quotation:

"LAW OFFICER: Has little Donna ever seemed fanciful or flighty? Is she careless with the truth? Has she ever shown a desire to hide behind certain facets of a story for possible reasons of protecting herself?

"A. Not that I know of.

"LAW OFFICER: In other words, what you are saying is that she is, as far as you know, a perfectly normal little child and you were surprised when she related what she did.

"A. Yes sir."

It is, of course, well-settled that the law officer is not a mere umpire in the contest between the Government and the accused. He can go beyond ruling on the admissibility of disputed items of evidence and ask questions to clear up uncertainties in the evidence or to develop further the facts for the better understanding of the court members. Consequently, the mere asking of questions by the law officer is not error. However, the law officer cannot lay aside impartiality, and become an advocate for one side or the other. If he does so, he commits reversible error. Applying these general rules to the facts of this case, the board of review concluded that the nature and the manner of the inquiry conducted by the law officer show at least an "apparent departure" from impartiality to advocacy on the part of the Government. It based its conclusion on four grounds:

1. The law officer invited examination of the accused as to why the sole witness for the prosecution might not be telling the truth.

2. The law officer's "obvious attempts" to support the child's credibility by the testimony of her mother.

3. That in the course of his examination of Mrs. Bishop, the law officer arbitrarily disregarded proper objections interposed by defense counsel.

4. That the law officer made "apparent" efforts to "allay the inherent possibility of doubt in the minds of the court which was suggested by their expressed question as to whether or not the alleged victim's mother may have influenced her child's testimony." In this regard, said the board of review, he elicited far more from her than a simple denial that she "put the child up" to testifying as she did, which was all that the court-martial was interested in.

We consider each of the reasons assigned by the board of review in turn.

1. *The invited question on the reason for the child's testimony.* The fact █ that the question was "invited" means nothing. We have already pointed out that the law officer can ask questions on his own initiative. That leaves us with the content of the question. Does it reflect partisanship? A case can be made for the conclusion that the question is one *more likely* to be asked by the prosecuting attorney than defense counsel because the answer might tend to limit the court-martial to consideration of the reasons advanced by the accused. Consequently, if they reject those reasons they might not look for other reasons raised by the evidence. But, there is more to the question than its suitability for defense or prosecution. In the light of the evidence it was an entirely logical question to ask.

The child testified one way; the accused another. The accused said he cared for the child; she indicated she did not like the accused, but she did not "exactly hate" him. What reason, then, could she have for testifying as she did? That is a natural question. The record shows that defense counsel himself felt its impact. As appears from the excerpt set out below, he himself *put the same question to the accused in his direct examination, immediately after the accused denied he had committed the acts charged.*

"Q [Defense Counsel]. Can you explain to this court why then, you think that Donna has fabricated this story?
"TRIAL COUNSEL: Objection.
"LAW OFFICER: Sustained."

Trial counsel objected to the question and the objection was sustained. No reasons were assigned in the objection and none were given in the ruling, but it is entirely possible the law officer disallowed the question because the form assumed that the child's testimony was "fabricated." We need not explore the correctness of the ruling. The significant fact is that the defense itself thought it appropriate, even desirable, to obtain a statement from the accused as to why the child may have told an untrue story. Under the circumstances, we cannot find in the question the slightest hint of an attitude other than an interest in the facts. We find no support whatever for the claim of partial conduct by the law officer.

2. *Obvious attempts to support the child's credibility by the testimony of the mother.* We are not █ certain whether the board of review intended here to imply that partisanship can be inferred because the law officer induced the court-martial to call the mother as a witness.[1] If this is the intention, it is

---

[1] The board of review twice referred to "the fact" that the child's mother "had been present in court during the entire proceedings." What relation this circumstance has to the conclusion of improper conduct on the part of the law officer is not made clear. Be that as it may, the record does not support the statement of the board of review. The representation that the mother was present was made for the first time in a supplemental brief before the board of review. The contention was predicated exclusively on the fact that there was no statement in the record that witnesses "not otherwise connected

very wide of the mark. The question alone does not show any design to have the mother as a witness; it asks only if the accused could offer a reason for deception by the child. The accused's answer provides the first inkling that the mother might be able to testify to more than the fact of disclosure by the child of the accused's acts. There is no intimation whatever of any intention by the law officer that the mother be called to support the child's testimony. Hence, the validity of this reason for the conclusion of the board of review must be considered from the standpoint of the content of the questions asked the mother. This, we consider, in the discussion of the fourth reason.

3. *Arbitrary overruling of objections.* During the law officer's examination of Mrs. Bishop, defense counsel interposed three objections. The board of review described the law officer's actions on the objections as "arbitrary." Since there is no determination of the merits of the objections, we suppose the characterization is intended to show partisanship on the part of the law officer. Again the record just does not support the conclusion. All three objections follow:

"LAW OFFICER: Mrs. Bishop, will you describe the precise circumstances which obtained when you first learned of your daughter's allegations which are the substance of this trial?

"A. She came home from school. All I can remember is that the day was the tenth. She saw that I was home. I got off early because I was not feeling well. She told me—

"DEFENSE COUNSEL: I object to what the daughter might have told her mother on the grounds of hearsay.

"LAW OFFICER: Mrs. Bishop, just tell exactly what happened. You said that you had a conversation with her?

"A. All she told me was, 'Promise me not to tell Joe, or I will get in trouble'. Then she told me—

"DEFENSE COUNSEL: Same objection.

"LAW OFFICER: You had a conversation and you were alone, is that correct?

"A. Yes sir. I am just telling you what she told me and that is the only thing I can say.

. . . . .

"LAW OFFICER: You have stated that your daughter told you a certain story and you were surprised and shocked?

"A. Yes sir.

"LAW OFFICER: Did that story reference four incidents or one incident?

"A. Four.

"DEFENSE COUNSEL: I object.

"LAW OFFICER: Overruled. The day that she first told you about the incident her story referenced four instances?

"A. Yes sir."

Although the law officer made no specific rulings on the first two objections, it is unmistakably clear he agreed with them and attempted to keep the witness from reciting the details of her conversation with her daughter. In other words, he tried to confine the witness to the fact that she had a conversation with her daughter and to get her to describe the circumstances under which the conversation took place. We see nothing arbitrary or capricious or partisan in this action.

The ground of defense counsel's third objection is not stated but probably it was predicated upon the same broad ground of hearsay. The objection was overruled without a statement of reasons. It is perhaps arguable that with the trial . . . [were not] present." The charge sheets showed Mrs. Bishop and the child as the only prospective prosecution witnesses. Exclusion of persons from the courtroom is normally limited to those expected to be called as witnesses. Manual for Courts-Martial, United States, 1951, appendix 8*a*, page 505. It is just as reasonable to infer from the absence of a statement of exclusion, that neither the mother nor the child were observed in the courtroom at the beginning of the trial. Hence no statement was necessary.

the ruling is incorrect because it improperly includes details of the complaint (Manual for Courts-Martial, supra, paragraph 142c, page 256), but that is another matter and one which must be considered with the fact that the whole subject of disclosure was opened by defense counsel in his cross-examination of the child. The reason under discussion is concerned with the arbitrariness of the ruling, not its content. We, therefore, reserve it for later discussion and consider now only the issue of arbitrariness. It is, of course, well-settled that the law officer is not required to give reasons in support of a ruling. Failure or refusal to provide an explanation for a ruling cannot therefore be regarded as an indication of arbitrary or capricious action. United States v Brown, 10 USCMA 482, 28 CMR 48.

4. *Content of the law officer's examination of Mrs. Bishop.* Earlier, we set out the scope of the examination and quoted representative questions asked by the law officer. Concededly, there is in both instances a departure from approved standards of practice. For example, the question on whether the child ever seemed "fanciful or flighty" is far from a model question. But we are not dealing with inapt or even inept questioning. Our task is to scrutinize the examination to determine whether it justifies the board of review's conclusion that it stamps the law officer as an advocate for the Government.

To begin with, the board of review apparently overlooked the significant fact that the court members gave the law officer a list of questions and that at the conclusion of his examination the law officer specifically asked if "that [was] the extent of the court's questions." The president asked the court members if they had any further questions. He also made the following statement to them.

 ". . . Any questions you have written and he has not asked will be presumed to be objectionable and will not be asked."

No further questions were asked. It seems to us, therefore, that the scope of the examination was not determined by the law officer contrary to the desires of the court-martial. Rather, it was obviously in direct accord with their requests. They, not he, wanted to elicit from Mrs. Bishop "far more" than a simple denial that she influenced the child to testify against the accused. Thus, the record is plainly contrary to the board of review's conclusion on this point.

Turning to the questions themselves, it is indeed regrettable that the court-martial's list of questions was not made an appellate exhibit. It is also regrettable that the record does not reflect whether the list was shown to defense counsel so that he could know and prepare himself to satisfy the doubts or desires of the court. Be that as it may, it is obvious on reading that almost the whole of the examination pertains to the marital disagreements between the witness and the accused. This was old stuff. The accused himself disclosed more details of those disagreements than did Mrs. Bishop. The reiteration, however, clearly served another permissible purpose, namely, to disclose Mrs. Bishop's attitude toward her marriage and toward the accused. It is plain that the court members, acting through the law officer, wanted to find out if, as indicated by the accused, her views were such that she might reasonably be expected to induce her daughter to testify falsely.

Most of the remaining questions dealt with the circumstances under which the child revealed the defendant's acts to her mother. Inquiry into this subject was the logical outcome of the accused's contention that the mother "put the child up" to presenting false allegations against him. If the circumstances were natural and innocent they would tend to give weight to the child's testimony. The scope of the examination was therefore both reasonable and permissible. Finally, there are the questions about the child's personality. Here again they are the natural and logical outcome of the accused's contention. What kind of person is the child? Is she given to fancy or imagination? If she is, it might reasonably be inferred that she

**123**

was fantasizing in her testimony. If there is no background for such conduct it might reasonably indicate she was telling the truth. The form of the questions was certainly poor, but their substance and their purpose were entirely proper. In that connection, it is worth noting that defense counsel, who earlier made clear that he did not fear objecting to questions by the law officer, interposed no objection to these questions. The failure to object does not mean the questions were proper, but it was the form not the substance that was objectionable. Improper form "does not by any means show that the law officer became a partisan advocate." United States v Weaver, 9 USCMA 13, 20, 25 CMR 275.

We find no justification for the board of review's "serious misgivings" as to the law officer's impartiality. In that regard we agree with dissenting Member Hunsecker that "neither bias nor hostility" appears in the record of trial. We conclude the record does not support the holding of the board of review that the law officer abandoned impartiality to assume the role of a partisan advocate. We answer the certified question in the negative.

A number of other assignments of error were presented to the board of review when the case was before it. Some were considered; others were not. Our opinion here, of course, does not prevent the board of review from considering the latter matters on remand. The record of trial is returned to The Judge Advocate General for resubmission to the board of review for further proceedings consistent with this opinion.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting):

I dissent.

In my opinion, the record of trial in this case discloses a substantial basis for the board of review's conclusion that the law officer departed from his role as a trial judge to become a partisan advocate.

The accused was found guilty of two specifications of sodomy, in violation of

124

Uniform Code of Military Justice, Article 125, 10 USC § 925, and two specifications of indecent acts with a minor child, in violation of Code, supra, Article 134, 10 USC § 934. He was also acquitted of two specifications of sodomy and two specifications of indecent acts. The sentence was approved by the convening authority. The board of review, however, set aside the findings and sentence on the basis of the law officer's conduct during the trial and ordered a rehearing. Thereafter, The Judge Advocate General of the Navy certified to this Court the question whether the action of the board was correct.

The revolting circumstances of the offenses charged need not be set out in detail. Suffice it to say that all the offenses charged related to the accused's alleged relations with his stepdaughter over a period of almost two years. At the time of trial, she was eleven years of age, and the prosecution's case was based solely upon her testimony. In addition to her assertions in support of the charges, she admitted testifying falsely in the pretrial investigation; that her complaint, made to her mother about ten days after the last incident, was precipitated by anger at her stepfather for corrective measures he employed; and that the accused and her mother were frequently at odds.

The defense produced the accused as its sole witness. He categorically denied the occurrence of the events related by his stepdaughter and set forth a summary of the unhappy events which had transpired since he became his wife's fourth husband. Fairness, however, requires the conclusion that the marital strife may be laid at the door of both parties. Following extensive cross-examination by the trial counsel, the following questioning was conducted by the law officer:

"EXAMINATION FOR THE COURT
"LAW OFFICER: Bishop, before you leave, you have heard Donna tell her story and your story is diametrically opposed to that?
"A. Yes sir.
"LAW OFFICER: Also in your testimony, you have indicated some solici-

tude for the child. Specifically one time you got some food for her and you went in to make sure she was covered. Those two occasions, anyway.

"A. On the occasion that I checked to see if she were covered, I was recalled from Midway.

"LAW OFFICER: I am not concerned with why you did it, but you did indicate some solicitude for the welfare of the child?

"A. I don't quite follow that word, sir.

"Q. You were interested in getting her something to eat and on one occasion you made sure that she was covered in bed?

"A. Yes sir, there have been numerous instances on that.

"LAW OFFICER: Have you ever had occasion to discipline that child?

"A. Well sir, more or less I guess, but most of my discipline was when we would sit down at the table I used to tell her to sit down and eat and not to sit down and chatter.

"LAW OFFICER: Did you ever strike the child?

"A. Yes sir, I spanked her twice. Once upon returning from Japan in 1955, and once at Alameda I give [sic] her a couple of swats with my hand.

"LAW OFFICER: Could you give any reason she would make such allegations against you? This is some indication that she was not antagonistic toward you.

"A. I don't know sir, unless it is her mother put her up to it, sir.

"LAW OFFICER: I see."

Thereafter, the president of the court indicated that the members desired to hear the testimony of accused's wife[1] concerning whether "the mother put the child up to this." Mrs. Bishop was called as a witness and interrogated by the law officer. Whether he depended solely upon a list of questions handed him by the court is unknown to us, for he omitted that important document from the record, despite the injunction of Code, supra, Article 54, 10 USC § 854. Moreover, he did not exhibit any proposed questions to either counsel in order that they might interpose appropriate objections.

The examination of Mrs. Bishop was conducted as follows:

"LAW OFFICER: Mrs. Bishop, will you describe the precise circumstances which obtained when you first learned of your daughter's allegations which are the substance of this trial?

"A. She came home from school. All I can remember is that the day was the tenth. She saw that I was home. I got off early because I was not feeling well. She told me—

"DEFENSE COUNSEL: I object to what the daughter might have told the mother on the grounds of hearsay.

"LAW OFFICER: Mrs. Bishop, just tell exactly what happened. You said that you had a conversation with her?

"A. All she told me was, 'Promise me not to tell Joe, or I will get in trouble'. Then she told me—

"DEFENSE COUNSEL: Same objection.

"LAW OFFICER: You had a conversation and you were alone, is that correct?

"A. Yes sir. I am just telling you what she told me and that is the only thing I can say.

"LAW OFFICER: It was on the tenth of December and she came home after school, is that correct?

"A. Yes sir.

"LAW OFFICER: She told you about certain alleged acts involving Bishop, is that correct?

"A. Yes sir.

"LAW OFFICER: Was there anyone else in the house at this time?

"A. No sir.

"LAW OFFICER: What precisely did you do immediately after hearing of her allegations?

"A. I asked her again, because I didn't believe it and I was stunned and shocked. Then I called the doctor. The doctor told me to bring her over right away so I brought her over. He called the security and told

---

[1] The issue of her competency is not before us. Hence, resolution of that question, as well as the other points presented by the record, must await the decision of the board on further review.

me to stay there. I went back to the house to get my clothes. That was the last I knew of it. I did not know he was arrested until the next day.

. . . . .

"LAW OFFICER: You have stated that your daughter told you a certain story and you were surprised and shocked?

"A. Yes sir.

"LAW OFFICER: Did that story reference four incidents or one incident?

"A. Four.

"DEFENSE COUNSEL: I object.

"LAW OFFICER: Overruled. The day that she first told you about the incident her story referenced four instances?

"A. Yes sir.

. . . . .

"LAW OFFICER: Has little Donna ever seemed fanciful or flighty? Is she careless with the truth? Has she ever shown a desire to hide behind certain facets of a story for possible reasons of protecting herself?

"A. Not that I know of.

"LAW OFFICER: In other words what you are saying is that she is as far as you know, a perfectly normal little child and you were surprised when she related what she did.

"A. Yes sir.

Following receipt of Mrs. Bishop's testimony, the trial proceeded to argument and instructions.

We have repeatedly pointed out the requirement that the law officer be impartial in the performance of his judicial duties. When he departs from that standard and assumes the role of partisan advocate, we have not hesitated in the past to conclude that reversal was required. United States v Ballard, 8 USCMA 561, 25 CMR 65; United States v Kennedy, 8 USCMA 251, 24 CMR 61. While such advocacy is not demonstrated simply by interrogation of witnesses to ascertain the facts of a case or to clear up a clouded area, I am certain that this law officer's conduct was pervaded with hostility to the accused's cause and demonstrates his partiality as a matter of law.

My brothers believe otherwise and

find a basis for their conclusion by separate consideration of the various events which transpired. Thus, they consider his conduct in four areas and determine that, in no part of the trial, did it amount to advocacy of accused's guilt.

At the outset, the law officer's cross-examination of the accused is dismissed as entirely "logical" in view of the testimony that there was no hatred between them and, therefore, no apparent reason for the victim to testify falsely. Indeed, it is said that the defense counsel attempted to conduct a similar examination of the accused but that the law officer prevented him from doing so by a ruling on the form of the question. These considerations beg the question presented by the certificate. We are inquiring into the conduct of the law officer to determine if it reveals partiality to the Government. Thus, it is incumbent upon us to examine his questioning of the accused to determine the possible motivation for the inquiries he made. Examination of the record, quoted supra, makes his reasoning at once apparent.

The initial question placed to the accused pointed up that the issue before the court-martial was solely one of the credibility of the victim as opposed to that of the defendant. Having established that predicate, the law officer proceeded to guide the accused into channels indicating there was no known reason for the child to make baseless allegations. Receiving answers indicating no motivation for a false complaint, he then demanded that the accused explain why the charges had been brought. When the accused replied that he did not know unless his wife "put her up to it," the attention of the court was aroused, and the law officer permitted the spouse to be called as a witness.

Every question put by the law officer was worthy of an astute cross-examiner intent upon impaling his victim upon the horns of a dilemma. The inquiry into the motivation for the charges could lead only to a confession of guilt on the one hand or an expression of ignorance on the other. The latter was

equally damaging, for it laid the foundation for the argument that no one had shown any reason for rejection of the victim's testimony—a telling forensic point. The fact that the defense counsel had earlier embarked upon an unsuccessful endeavor to investigate the same area is totally irrelevant. He may be excused for his carelessness or, indeed, the prosecutor may take advantage of it in his closing argument. However, the same questions asked by a judicial figure at once place him under suspicion. That suspicion, in turn, is hardened into certainty by his examination of the wife.

The author of the principal opinion brushes lightly over the contention that the law officer attempted to support the child's credibility with his examination of the mother. It is admitted that "there is . . . a departure from approved standards of practice" although they are not set out, but it is argued the board of review overlooked the "significant fact" that the court members gave to the law officer a list of questions and that the latter inquired, at the conclusion of his examination, whether "that [was] the extent of the court's questions." Once again, I suggest these are irrelevant considerations. We are concerned with the law officer's conduct, and it is from *his* phrasing of the questions put to the witness that the board of review found partisan advocacy. Moreover, the list of questions is omitted from the record of trial, and we indulge in the sheerest of speculation when we assume that the inquiries were made in a form proposed by members of the court-martial. Indeed, it is little short of unreasonable to say they possessed the talent to phrase questions so artfully. Certainly, we should not assume they were responsible for the queries when the law officer did not even follow the sound practice of permitting counsel to examine the written questions submitted to him by the court.

Turning to the content of the law officer's examination of Mrs. Bishop, it is glaringly demonstrated that he was intent upon building up the victim's credibility. Ignoring the objections of counsel, he elicited the details of a so-called "fresh" complaint involving incidents which occurred from eighteen months to twelve days prior to the date on which the child made her grievance known. Moreover, he was careful to have the mother make her reaction known, although that was a totally immaterial consideration. He ended his interrogation of the mother with the rhetorical question "that she is, as far as you know, a perfectly normal little child and you were surprised when she related what she did." These questions were not clumsily phrased. On the contrary, they were very skillfully put. The end sought is obvious—to convince any doubters on the court-martial that the accused was indeed guilty, as the little girl was a model of propriety and Mrs. Bishop had implicit faith in her credibility.

Finally, it is necessary to consider the question whether the law officer acted arbitrarily in over-ruling objections advanced by defense counsel. My brothers believe "the record just does not support the conclusion" that the rulings may be so characterized. They admit that he made "no specific rulings" with respect to two objections to Mrs. Bishop's interrogation but hold that "it is unmistakably clear he agreed with them and attempted to keep the witness from reciting the details of her conversation with her daughter." I conclude differently. Mrs. Bishop was permitted to state over objection that her daughter told her, "Promise me not to tell Joe, or I will get in trouble." The law officer's questions then included statements which, considered in light of the witness' affirmative replies, indicated the victim had told her "about certain alleged acts involving Bishop." The story involved "four incidents." None of the inadmissible statements were stricken, nor was any instruction given to the members of the court to disregard Mrs. Bishop's testimony. Hence, I hardly think it proper to infer that he agreed with the well-founded objections of counsel, for he placed before the court everything sought to be excluded. Once again, my scrutiny of the record

impels in me the belief that the law officer sought thereby to discredit accused's denial of guilt.

These considerations convince me the law officer cast aside his judicial robes in order to join the prosecution in this case. His examination of the accused and Mrs. Bishop, as well as his refusal to accord any recognition to the objections made by defense counsel during the testimony of the latter witness, indicate beyond cavil that his only interest was to present the alleged victim to the court as a normal, well-adjusted child and assiduously to undermine the accused's protestations of innocence. Almost every question asked by him shouts that its purpose was to impart credibility to the little girl and to insure rejection of accused's denials. Such participation indicates, as a matter of law, that this officer had aligned himself with the Government. The findings of guilty establish the success with which his efforts were crowned.

I would affirm the decision of the board of review.