**UNITED STATES**

**v.**

**William D. SOWDERS, Sergeant (E–5), U.S. Marine Corps.**

**NMCM 97 01873.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 2 April 1997.

Decided 18 April 2000.

Maj Stephen D. Chace, USMC, Appellate Defense Counsel.

Capt Curtis M. Allen, USMC, Appellate Defense Counsel.

Maj Troy D. Taylor, USMC, Appellate Government Counsel.

Before LEO, Senior Judge, ANDERSON, and NAUGLE, Appellate Military Judges.

LEO, Senior Judge:

Contrary to his pleas, the appellant was convicted at a general court-martial before members of conspiracy to commit larceny, false official statement, larceny, and obstruction of justice, in violation of Articles 81, 107, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 921, and 934. He was awarded a bad-conduct discharge, confinement for two years, total forfeitures, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

We have examined the record of trial, the appellant's thirteen assignments of error, and the Government's responses. Finding merit in the three issues addressed below,[1] we set aside the findings and sentence.

## I. BACKGROUND

Shortly after midnight on 29 June 1996, PFC Bittinger, one of the co-conspirators, was on duty as a military policeman on board Marine Corps Recruiting Depot, San Diego. At 0135, he called the Base Provost Marshal's Office [PMO] to report that he had found the front door to the Recruit Exchange building unlocked while making his security rounds. He was instructed to wait outside the building until a back-up unit arrived at the scene. The appellant, who was the acting PMO watch commander at the time, went to assist him. When the appellant arrived just a few minutes later, he and PFC Bittinger conducted a security sweep inside the building for possible intruders. Upon checking the manager's office, they found that the office safe was also unsecured. The safe had an alarm system that sounded audibly inside the manager's office and at PMO if the safe was opened after the alarm had been set. A printout from the alarm system recorder at PMO showed that the alarm was set off at 0143, indicating the safe had been opened. About this time, the appellant called from the manager's office and reported to the PMO desk sergeant what he had found. In addition to an investigative unit, Exchange personnel were summoned to the building. After the contents of the safe were inventoried, the Exchange personnel reported that $8,000 in cash was missing.

Approximately two months later, PFC Bittinger admitted to investigators from the Naval Criminal Investigative Service [NCIS], after failing a polygraph examination, that he had information concerning the missing money. He told them that the appellant had opened the safe and taken the money from it. He claimed that he did not say anything at first because the appellant told him to remain silent about what he had seen. He also said there was a third Marine present, LCpl Sepulveda, who had been in the manager's office with them and had witnessed this event.

When interviewed by the investigators, LCpl Sepulveda initially denied any involvement in the theft, but eventually admitted that he was present at the scene. He stated that he saw the appellant remove the money from the safe. The appellant then gave the money to him, telling him to depart the area and hide it. He stated that the appellant contacted him later that morning and re-

---

1. II. APPELLANT WAS DENIED A FAIR TRIAL WHEN THE MILITARY JUDGE ABANDONED HIS IMPARTIAL ROLE AND INSTEAD BECAME A PARTISAN ADVOCATE FOR THE GOVERNMENT.

III. SPECIAL AGENT GIORDANI OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE IMPROPERLY RENDERED HIS CONCLUSION THAT APPELLANT WAS GUILTY OF CONSPIRACY TO COMMIT LARCENY AND LARCENY.

VIII. BASED ON THE CUMULATIVE EFFECT OF ASSIGNMENTS OF ERROR I–VII, APPELLANT WAS DENIED A FAIR TRIAL.

trieved the money. PFC Bittinger and LCpl Sepulveda both denied keeping any of the stolen money for themselves. At the time of this court-martial, both of them acknowledged that they had already been convicted for their respective roles in the larceny.

At trial, PFC Bittinger and LCpl Sepulveda testified in accordance with their earlier statements alleging that the appellant had taken the money. They further stated that they assisted him in covering up the larceny because he was a sergeant and they were simply following his orders. Testifying on his own behalf, the appellant adamantly denied taking the money and stated that he was not even aware that LCpl Sepulveda was involved until he was informed by the investigator interrogating him.

## II. IMPARTIALITY OF MILITARY JUDGE

The appellant contends that he was denied a fair trial because the military judge abandoned his impartial role and became a partisan advocate for the Government. He argues that the military judge did so by questioning him in a manner intended solely to discredit him before the members.[2] We agree.

### A. FACTS

The appellant was called as the final witness for the defense. After lengthy questioning by counsel for both sides, the military judge began a series of his own questions. Shortly after starting, however, he was interrupted by the trial defense counsel, who objected on the grounds that the appellant was being asked to speculate about matters of which he had no personal knowledge. The military judge overruled the objection without comment and continued with his questions. The text of the questioning is provided below:

MJ: Sergeant Sowders, do you think that Mr. Morales [the assistant store manager] took the money?

2. The appellant also argued that the military judge abandoned his impartial role by improperly interfering with the trial defense counsel's cross-examination of LCpl Sepulveda, when the military judge stopped further inquiry by his

ACC: I don't know who took it, sir.

MJ: Do you think Mr. Woods [the store manager] might have taken it?

ACC: There are many things that have crossed my mind, many different ways somebody could have. I don't know. I don't know.

MJ: Well, we know that Private Sepulveda pled guilty to stealing the money. Why do you think he would plead guilty to stealing the money if he didn't steal the money?

ACC: Probably because he stole it.

MJ: Okay. So, therefore, that would be your main suspect, then, in your mind?

ACC: In my mind, yes, sir.

MJ: And how would he have been able to do that?

DC: Sir, I'm going to object to speculation. I know you're the military judge, sir, but I believe these questions are causing the witness to speculate as to possible scenarios. He knows what he did. He knows what he did only, sir.

MJ: All right. Your objection is noted for the record but it's overruled.

Questions by the military judge continued:

MJ: So how could he have done this then?

ACC: I don't know, sir. He's been there longer than I have. He knows the base better than I do. He knows how that particular PMO works, honestly, better than I do.

MJ: All right. And you testified that every time you saw Bittinger, you envisioned a question mark over his head; is that right?

ACC: That's correct, sir.

MJ: Do you think that he's pretty naive and unsophisticated?

ACC: He portrayed himself that way.

counsel several times and instructed his counsel to "move on." Appellant's Brief of 6 October 1998 at 21. We find this part of the appellant's claim to be without merit.

MJ: Okay. We know that he's also pled guilty to helping steal this money, correct?

ACC: Yes, sir.

MJ: So do you think that perhaps he was duped into stealing this money by Lance Corporal Sepulveda?

ACC: Yes, sir.

MJ: So you think that both of them were working together and stole the money?

ACC: That's what it's looking like. I don't know how Sepulveda or him [sic] planned it out or got together or what happened. But yes, sir, that's what it's looking like.

MJ: And both of them together agreed to frame you?

ACC: I believe so. I don't know whether it was after or before they committed the crime. But in some time, yes, I do believe they got together.

MJ: And of all the military police on the force, why do you think they would pick you out to frame?

ACC: I don't know. I have no clue. Maybe because I was there. I did respond to the call which I did not have to. I could have sent someone else. I don't know.

MJ: And you think that the existence of this tape that was perhaps accidentally taped over would prove that?

ACC: Yes. It would prove my innocence.

MJ: How would it do that?

ACC: It has what I said. It has radio messages before the incident even occurred. There is a lot of evidence there. The main purpose of having that is recording voices or messages, preserving that piece of time to be used at a later date. And, on top of that, it has the times of when or what something was said.

MJ: Okay. And do you think Corporal Milburn [PMO desk sergeant on night of incident] had anything to with this theft?

ACC: No, I do not.

MJ: So do you think that his testimony in here is his recollection of what was said was incorrect or is he lying or what?

ACC: I don't want to say he's lying, but to the best of his recollection. It's the best of his recollection. I can't agree or disagree.

MJ: Okay. Any questions in light of mine?

Record at 306–08.

After his earlier objection was overruled, the appellant's defense counsel attempted to mitigate the effect of the military judge's questions with additional questions of his own:

Q. Sergeant Sowders, you don't know who took the money, right?

A. No, I do not, sir.

Q. The answers you were giving to the military judge[,] you were speculating, correct? You were guessing; you were giving your best guess, correct?

A. I wasn't—I was—I guess so. Yes, sir. Guessing, speculating.

Q. In that vein, isn't it possible somebody could have stolen the money right before you showed up or right after when you left?

A. Possibilities are endless. Yes, it is possible. That's one possibility.

DC: Thank you. I have no further questions, sir.

Record at 308.

### B. LAW

A basic right of military due process is the right to "a judge who appears impartial throughout [an accused's] court-martial." *United States v. Cooper*, 51 M.J. 247, 250 (1999); *United States v. Grandy*, 11 M.J. 270, 277 (C.M.A.1981); RULE FOR COURTS-MARTIAL 801(c), Discussion, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). It has, however, "long been the law" that the military judge has the power to question witnesses. *United States v. Dock*, 40 M.J. 112, 127 (C.M.A.1994). The military judge does not lay aside his impartiality by asking appropriate questions "to clarify fac-

tual uncertainties." *United States v. Reynolds*, 24 M.J. 261, 264 (C.M.A.1987).

In *United States v. Acosta*, 49 M.J. 14 (1998), the Court of Appeals for the Armed Forces held that "Article 46, UCMJ, 10 USC § 846, and [Military Rule of Evidence] 614, Manual for Courts–Martial, United States (1995 ed.), provide wide latitude for a military judge to ask questions of witnesses called by the parties." *Acosta*, 49 M.J. at 17. Furthermore, "[n]either Article 46 nor Mil. R.Evid. 614 precludes a military judge from asking questions to which he may know the witness'[s] answer; *nor do they restrict him from asking questions which might adversely affect one party or another.*"[3] *Id.* at 17–18 (emphasis added).

 But, the Court also recognized that the military judge walks a "tightrope" in examining a witness. *United States v. Ramos*, 42 M.J. 392, 396 (1995). He may elicit or clarify relevant information to assist the court-martial members in their deliberations, but must do so in a way that "scrupulously [avoids] even the slightest appearance of partiality." *Id.* (quoting *United States v. Shackelford*, 2 M.J. 17, 19 (C.M.A.1976)). The Court noted long ago that the members expect counsel to be partisan advocates and will view the presentation of evidence and arguments by counsel in that light. *Grandy*, 11 M.J. at 277. On the other hand, "[their]

expectation of impartiality on the part of the judge is so great that, when he does take sides, the members can hardly avoid being influenced substantially by his advocacy." *Id.*

The legal test that flows from all this is whether, "taken as a whole in the context of this trial," a court-martial's "legality, fairness, and impartiality" were put into doubt by the military judge's questions. *United States v. Reynolds*, [24 M.J.] at 265. This test is applied from the viewpoint of the reasonable person. *Ramos*, 42 M.J. at 396 (citing S. Childress & M. Davis, 2 *Federal Standards of Review* § 12.05 at 12–38 (2d ed.1992)).

## C. ARGUMENTS OF THE PARTIES

The appellant relies primarily on *Shackelford* and *United States v. Clower*, 23 U.S.C.M.A. 15, 48 C.M.R. 307, 1974 WL 13822 (1974) to support his argument that these questions were not used by the military judge to clarify his testimony or to develop the facts in his case. The appellant points out that similar questions had already been asked of him by the trial counsel during cross-examination.[4] Instead, the appellant argues, the military judge's questions were intended solely to make him look guilty; they were "leading, accusatory, and sarcastic," Appellant's Brief at 19, and they "required [him] to explain things he simply could not:

**3.** *See United States v. Martin*, 189 F.3d 547, 554 (7th Cir.1999)("[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover.")

**4.** The trial counsel asked the appellant the following questions during cross-examination:

TC: And you were in that building at 0143, right?
ACC: Approximately, sir. Yes, sir.
. . . .
TC: So who opened the safe at 0143 to make the alarm go off?
ACC: I don't know.
. . . .
TC: So while you were in the building, someone else opened that safe?
ACC: I don't know sir. I'm saying I did not open the safe though.
. . . .
TC: The alarm went off while you were in there, but you didn't open it?
ACC: That's correct, sir.

TC: And PFC Bittinger didn't open it?
ACC: That's correct, sir.
TC: Somebody else opened it?
ACC: That's correct, sir.
TC: And you didn't see anyone else in there, right?
ACC: No, I did not, sir.
TC: It's your testimony today that Bittinger and Sepulveda are lying, right?
ACC: Yes, sir.
TC: Together they're lying to get you?
ACC: Yes, sir.
TC: But you always treated them well, right?
ACC: Yes, sir.
. . . .
TC: No reason at all for them to lie against you, right?
ACC: No reason at all, sir.
TC: Lance Corporal McCleskey, does he have anything against you?
ACC: No, sir.
Record at 294–96.

the mindset and motives of [PFC] Bittinger and [LCpl] Sepulveda [the Government's key witnesses]; and how they pulled off the crime, when he did not witness it." *Id.* at 20. Moreover, since "the military judge did not ask a single question of PFC Bittinger or LCpl Sepulveda,"[5] the appellant contends the prejudicial effect of the judge's questions on his right to a "fair trial" would have been especially pronounced in the eyes of the court-martial members. *Id.* at 21.

Citing *Acosta* and *Ramos,* the Government argues that the military judge did not abandon his impartial role because he only asked "clarifying" questions that he was entitled to ask; the questions explored the defense theory of the case and gave the appellant "a full opportunity to explain himself and his thoughts on who may have committed these crimes and why." Government Brief of 5 March 1999 at 17. Even if the military judge did err, the Government contends the error was harmless since the questioning comprised only two of the 392 pages in the record and the evidence was otherwise overwhelming. *Id.* at 17–18.

## D. DISCUSSION

■ Initially, we must examine the *relevance* and *purpose* of the questions before us.[6] The military judge is not exempt from the evidentiary rules applicable to counsel. Parties may object on legal grounds to the questions asked by him. *Acosta,* 49 M.J. at 17. His questions must seek evidence that is relevant and material to the issues at hand. MIL.R.EVID. 402. Even if the evidence is relevant, it should not be admitted "if its probative value is substantially outweighed by the danger of *unfair prejudice,* confusion of the issues, or misleading the members...." MIL.R.EVID. 403 (emphasis added).

■ We note preliminarily that the recent decisions of our superior Court have upheld the actions of the military judge against claims of judicial partiality during the questioning of witnesses. *See generally Cooper*; *Acosta*; *Ramos*; *Dock.* However, the questions in those cases were directed not to the accused, but to other witnesses. This is significant only because the examination of an accused by the judge—particularly on matters that go to the heart of the defense—has been noted by some federal circuits to present risks that require special care to ensure the jury's ability to impartially decide a case is not affected. *See United States v. Saenz,* 134 F.3d 697, 709 (5th Cir.1998); *United States v. Mazzilli,* 848 F.2d 384, 388 (2nd Cir.1988).

In this instance, some of the judge's questions invited the appellant to speculate before the members, rather than testify about things that he knew or had observed; some appear calculated to express the judge's skepticism about answers that the appellant had previously given; and still others required the appellant to ratify *the judge's characterization* of the defense case, which differed from the argument put forward by the defense counsel at the close of the evidence. *See* Record at 329–38. It is also noteworthy that counsel for both sides had just completed a thorough examination of the appellant totaling 27 pages of testimony in the record, when the military judge decided on his own initiative to follow up with not just one or two, but a series of questions that repeatedly forced the appellant into the lame response of "I don't know" before the members.

These questions may have been *relevant* to the issue of the appellant's credibility, but counsel had already elicited similar responses from the appellant with their questions.[7]

---

5. In fact, the military judge did ask LCpl Sepulveda a total of twelve questions seeking clarification of earlier testimony that had been given. Record at 208–09. However, the judge did so *only* pursuant to questions submitted by one of the court-martial members. *See* Appellate Exhibit V.

6. The nature, as well as the number, of the court's questions is important in determining

their impact upon the trial. *United States v. Saenz,* 134 F.3d 697, 702 (5th Cir.1998).

7. The defense counsel's questions along this line were essentially limited to the following exchange:

 Q. Do you know why these Marines would make up this charge against you?

 A. From the little that I know of them[,] no. I know from the little I know of them,

Whatever probative value lay in this type of questioning by the military judge was substantially outweighed by the danger of unfair prejudice due to the appearance of partiality. The questioning suggested, without explicitly saying so, that the Government's two eyewitnesses were telling the truth. It also tended to convey to the members the notion that the burden of proof had somehow shifted to the appellant to rebut or explain away the evidence in the Government's case and show why he was not guilty. The military judge did give the obligatory instruction at the conclusion of the evidence, which states: "The burden never shifts to the accused to establish innocence or to disprove the facts necessary to establish each element of each of the offenses." Record at 351; Art. 51(c)(4), UCMJ, 10 U.S.C. § 851(c)(4). However, the sufficiency of this later instruction was impaired by the conflicting message in the military judge's questions, which suggested otherwise.

The questioning by the military judge here was markedly different from the recent cases decided by our superior Court. Its *purpose* was to impeach the appellant by showing rather transparently that the military judge did not find the appellant's testimony to be particularly credible. Because the questions were largely cumulative, they could not have been intended to "clear up uncertainties in the evidence or develop the facts further." *Ramos,* 42 M.J. at 396. *See Clower,* 48 C.M.R. at 310 (the absence of any necessity to clarify or further develop accused's testimony is a factor in determining whether military judge's questions created an appearance of partiality). While going over matters previously covered by counsel can sometimes be a factor in finding that a military judge did *not* abandon his impartial role (*See, e.g.,*

*Cooper,* 51 M.J. at 250; *Acosta,* 49 M.J. at 18), the method of questioning in this case left us with the distinct impression that the military judge had imparted to the members, intentionally or not, his skepticism of the appellant's claim of innocence. It is reasonable to assume that it left a similar impression on the court-martial members.

Although there was similar questioning in *United States v. Bishop,* 11 U.S.C.M.A. 117, 28 C.M.R. 341, 1960 WL 4435 (1960), we believe the facts are distinguishable. In that case, the military judge asked the accused to speculate on why the alleged victim would make such an allegation against him. The accused responded by saying that he did not know, but surmised the victim's mother may have put her up to it. *Bishop,* 28 C.M.R. at 344. The Court held that the military judge had not abandoned his impartial role by asking that *one* question. It found not only was the question logical ·in view of the conflicting testimony, but the defense counsel himself had put the same question to the accused on direct examination.[8] Most importantly, the Court found nothing in the question to show that the military judge was interested in anything other than the facts. *Id.* at 345.

Likewise, the situation in this case is distinguishable from the facts in *Reynolds,* where the military judge sharply rebuked the accused by asking, "Are we playing with the words, or are you changing your testimony, or what?" *Reynolds,* 24 M.J. at 265. While condemning the tone of the military judge's utterance, the Court in that case held that it was not *"tantamount to an expression of a positive or definite opinion of the guilt of the accused;* and it [did] not raise substantial doubt as to the proceeding's legality,

Sepulveda wasn't a good Marine[,] but I didn't judge him. No big deal to me. It was a challenge for me. I could teach him. I'll change him.—
Q. Sergeant Sowders,—
A. —Bittinger was full of questions. He had a big question mark over his head every time I saw him and I always took time for him.
Q. Did you ever tell PFC Bittinger not to give a truthful statement to the investigator?
A. No, I did not.
Q. Did you ever see anybody take that money out of that safe?

A. No.
Q. Do you know who took the money out of the safe?
A. No, I do not.
Q. Did you, yourself, take that money?
A. No, I did not. I did not take any money. I took nothing.
Record at 291.

8. Interestingly, the military judge sustained the Government's objection when the defense counsel attempted to ask that question. *Bishop,* 28 C.M.R. at 345.

fairness, and impartiality." *Id.* (emphasis added).

The facts in this case are more in line with those found in *Clower,* an opinion that has been consistently cited in decisions by this Court and our superior Court whenever the issue of judicial impartiality has been raised. Like this case, the military judge in *Clower* conducted his own lengthy examination of the accused after a "thorough and incisive" examination by counsel. *Clower,* 48 C.M.R. at 310. He did so in a manner that our superior Court characterized as "akin to impeachment" before it reversed the conviction. *Id.* The Court held that the error was not sufficiently ameliorated by the general cautionary instruction given before findings. *Id.*

Regardless of how the appellant in this case answered, the net effect upon the members of hearing these questions proposed by the military judge—as opposed to counsel—was to convey to them the judge's disbelief of the appellant's testimony and, by extension, his belief that the appellant was guilty. This is plainly advocacy, not fact-finding. *See Reynolds,* 24 M.J. at 265 (military judge's expression of his opinion on guilt of accused is a key factor in reviewing judicial duty of impartiality).

We next examine the military judge's questions in the context of the entire record to determine if they have placed in doubt the "legality, fairness, and impartiality" of the court-martial proceedings under an objective "reasonable person" standard. *Ramos,* 42 M.J. at 396; *see also Acosta,* 49 M.J. at 18 (whether a reasonable person viewing questions of the military judge in proper context would have doubts about judge's impartiality). We conclude that a reasonable doubt has been raised in this case. First, the legality of a proceeding is called into question whenever the military judge intrudes upon the members' fact-finding function. It is the duty of the jury, not the judge, to assess the credibility of the witnesses as it goes through the process of deliberating on the guilt or innocence of the accused. *United States v. Tilghman,* 134 F.3d 414, 416 (D.C.Cir.1998). "The jury cannot be regarded as having freely come to its own conclusions about the defendant's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony." *United States v. Filani,* 74 F.3d 378, 386 (2nd Cir.1996)(quoting *Mazzilli,* 848 F.2d at 388).

Second, while the Government's case is strong, we do not find it to be overwhelming. Accordingly, we cannot say that the evidence would have compelled the members to find the appellant guilty beyond a reasonable doubt on each and every charge. The credibility of the main witnesses for both the Government and the defense was critical to the outcome of this case. In such an instance, the Court of Appeals for the Fifth Circuit observed in *Saenz* that "[the] questions a judge asks those witnesses implicating their credibility assume heightened importance." *Saenz,* 134 F.3d at 702. The Government had argued the implausibility of two eyewitnesses incriminating themselves with a story to falsely accuse the appellant, particularly when their testimony is compared with other evidence showing the time when the safe was opened prior to the discovery of the theft. On the other hand, the appellant had argued that (1) it was implausible—given his military record, family background, and law enforcement experience—that he would have committed such an offense in the first place; (2) it was not likely that he would have attempted such a crime in front of two eyewitnesses he barely knew and expect to get away with it; and (3) it was equally unlikely that these two eyewitnesses, who were of questionable character, would have put themselves at risk for no reason other than to protect the accused. By injecting his assessment of the evidence into the trial, the military judge unfairly deprived the appellant of whatever chance he might have had to persuade the members that he was telling the truth. *See Clower,* 48 C.M.R. at 310 (judicial impartiality is particularly important in a close case where defense success depends on members' acceptance of accused's testimony); *Filani,* 74 F.3d at 385 (when credibility of defendant-witness is a key issue in outcome of a case, court's attack on defendant's veracity deprives him of a fair trial).

Third, the influence that a judge exercises over a jury is significant. *Clower,* 48 C.M.R. at 310. Therefore, it is wishful thinking to

expect the expression of a substantive opinion by the military judge, directly or indirectly, on the state of the evidence does not affect the impartiality of the proceedings as a whole. In this case, the appellant was the last witness heard by the members before they deliberated on findings. Their impressions of the military judge's questions to the appellant were still fresh in their minds, particularly after the trial counsel briefly reminded them during his argument. Record at 326. As our superior Court observed in *Clower*, "Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Clower*, 48 C.M.R. at 310 (quoting *Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946)).

Finally, although the military judge's intrusion was an isolated episode, it was not a minor procedural misstep, nor did it concern a matter far removed from the main issues, that it can easily be dismissed as harmless. Again, in *Clower*, our superior Court noted:

> Common among jurors is the propensity to tune in on and adopt a trial judge's appraisal of the facts.... Extreme caution must be observed to prevent a joinder of an exposure of a trial judge's view of the facts and a juror's natural curiosity about and affinity for that view from causing any abandonment of each juror's personal fact-finding responsibility.

*Id.* Questions styled to impeach an accused, regardless of his answers, places the military judge into the role of an advocate. In this case, it was especially prejudicial to the appellant because it occurred at a *critical* point in the proceedings. The issuance by the military judge of a standard jury instruction to "disregard" must be considered in determining whether he breached his duty of impartiality. *Cooper*, 51 M.J. at 251; *Acosta*, 49 M.J. at 18; *Clower*, 48 C.M.R. at 310. We believe the breach in this case was egregious enough to lie beyond the cure of such an instruction.

In summary, we find that the military judge demonstrated obvious partiality before the members when he questioned the appellant. By doing so, he created a reasonable doubt as to the legality, fairness, and impartiality of this court-martial proceeding.

## III. OPINION TESTIMONY OF GOVERNMENT WITNESS REGARDING APPELLANT'S INVOLVEMENT IN CONSPIRACY

■ The appellant also contends that the military judge erred in admitting the testimony of Special Agent Giordani of the Naval Criminal Investigative Service [NCIS] in which Giordani concluded, in the presence of the members, that the appellant had conspired with LCpl Sepulveda and PFC Bittinger to commit the larceny. We agree.

At trial, the president of the panel, Colonel Dallaire, submitted written questions to the military judge for Special Agent Giordani asking: "[1] Was money ever recovered? [2] What results/conclusions of the NCIS investigation? [3] Was it based only on statements of suspects?" Appellate Exhibit XIV; Record at 242. The trial defense counsel indicated that he had no objections. *See* Appellate Exhibit XIV. The military judge then proceeded to question Special Agent Giordani:

Q. And what were your conclusions—you weren't the control agent in this particular case, were you?

A. I was the control agent, sir. I was not the responding agent.

Q. Okay. Did you author the report?

A. Yes, I did.

Q. What were your conclusions in this particular case? Did you, as the NIS control agent, consider this case solved?

A. Yes, I did.

Q. What were your conclusions in this case?

A. *My conclusions were that Sergeant Sowders, Lance Corporal Sepulveda, and PFC—Private First Class Bittinger conspired to steal the $8,000.*

Q. And that's what your report—the conclusions of your report, is that what you reflect in your report?

A. That is correct.

MJ. Okay. [To the president] Sir, does that answer your questions? All

right. Affirmative response by the president.

Record at 243 (emphasis added).

The trial defense counsel did not object to any of the responses given by the witness. Instead, he attempted to clarify on recross-examination that the investigator did not have any incriminating admissions from the appellant or any evidence as to what became of the stolen money and that the investigator was basing his conclusion solely on the statements of LCpl Selpulveda and PFC Bittinger and the evidence of the safe's alarm system. Record at 243–44. However, on redirect examination, the trial counsel immediately had the investigator identify all of the matters that he considered in arriving at his conclusion, including the polygraph examination[9] taken by PFC Bittinger. Record at 244–45. The military judge overruled the defense counsel's hearsay objection to the polygraph results and instructed the members not to consider the witness's answer for the truth of the matter asserted. *Id.* The military judge reminded the members later in his general instructions that it was their duty to determine the credibility of the witnesses. Record at 349. However, he did not give them a specific instruction to *disregard* the testimony that the appellant now challenges.

Even though the appellant failed to object to the testimony,[10] the Government concedes that the admission of this evidence was an "obvious" error. Government Brief of 5 March 1999 at 20. Generally, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." Mil.R.Evid. 704. However, this rule does not extend to opinions on the guilt or innocence of an accused. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), App. 2, at A22–48; *United States v. Cameron,* 21 M.J. 59, 63

(C.M.A.1985); *United States v. Snipes,* 18 M.J. 172, 179 (C.M.A.1984). In the context in which it was given, the witness's conclusion that the appellant had conspired with PFC Bittinger and LCpl Sepulveda to steal $8,000 was clearly an opinion that the appellant was guilty of the charges before the court. It intruded impermissibly on an area reserved solely for the trier of fact.

Because the objectionable testimony came in response to a question from the president of the court-martial panel, we find its admission to be especially prejudicial. In the absence of a curative instruction by the military judge, the fact that the senior member was expressly interested in the Government investigator's conclusion about the evidence makes it very likely that this testimony went into the deliberation room with the panel members and affected their findings.

## IV. CUMULATIVE ERROR

In determining whether "the doctrine of cumulative error," *United States v. Walters,* 4 U.S.C.M.A. 617, 16 C.M.R. 191, 209, 1954 WL 2442 (1954), should be applied in this case, we are convinced that the military judge's abandonment of his impartial role, by itself, is enough for reversible error. However, even if it is not, we believe the cumulative effect of the appearance of judicial partiality and the inadmissible opinion testimony is sufficiently prejudicial to require reversal. *See United States v. Dollente,* 45 M.J. 234, 242–43 (1996)(it is a "well-established" rule that an accumulation of errors not reversible individually may be sufficient to warrant a rehearing).

Both errors have the same general tendency to interfere with the panel's duty to come to its own conclusions about the state of the evidence and the credibility of the witnesses. We do not believe the instructions given at the end by the military judge are enough to overcome their prejudicial effect, nor do we

---

9. It was clear from the entire record that the references to the polygraph tests were made with the active concurrence of both parties, notwithstanding the prohibition under Mil.R.Evid. 707(a), because it helped their respective cases. The Government used it to show the reason that the witnesses finally decided to confess; the defense used it to attack the credibility of these witnesses and show why they could not be believed.

10. To preserve an evidentiary issue for appellate review, an accused must make a timely objection at trial. MILITARY RULE OF EVIDENCE 103(a)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Otherwise, he must show that it was "plain error." *United States v. Cardreon,* 52 M.J. 213, 216 (1999); *United States v. Kirt,* 52 M.J. 699, 705 (N.M.Ct.Crim.App.2000).

believe the evidence of the appellant's guilt is sufficiently "overwhelming" to be unaffected by them. *Dollente*, 45 M.J. at 242–43. Accordingly, over the course of a two-day trial that was hotly contested, we cannot reasonably discount the possibility that the errors had a substantial effect on the findings. *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A.1992). In this instance, we conclude that the appellant was denied his right to a fair trial. Art. 59(a), UCMJ, 10 U.S.C. § 859(a).

## V. DISPOSITION

We hereby set aside the findings and sentence. The record is returned to the Judge Advocate General for submission to an appropriate convening authority, who may order a rehearing.

Judge ANDERSON and Judge NAUGLE concur.